**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alexander OVALLE (94–1566); John Ovalle, Jr. (94–2044); Benito S. Canales (94–2100); Nicholas A. Garcia (94–2263), Defendants–Appellants.**

Nos. 94–1566, 94–2263, 94–2044 and 94–2100.

United States Court of Appeals, Sixth Circuit.

Argued April 28, 1997.

Decided Feb. 23, 1998.

Rehearing Denied April 22, 1998.

---

David Debold (argued and briefed), Office of the U.S. Attorney, Detroit, MI, for Plaintiff-Appellee.

Robert O. Switzer (argued and briefed), San Antonio, TX, for Defendant-Appellant Alexander Ovalle.

Rodney J. O'Farrell (argued and briefed), Saginaw, MI, for Defendant-Appellant John Ovalle, Jr.

Louis W. Correa (argued and briefed), Phillip R. Spicer, Jr. (briefed), Taylor, Holiner & Spicer, San Antonio, TX, for Defendant-Appellant Benito S. Canales.

David C. Thomas (argued and briefed), Chicago, IL, for Defendant-Appellant Nicholas A. Garcia.

Before: GUY, MOORE, and COLE, Circuit Judges.

## OPINION

MOORE, Circuit Judge.

Defendants-Appellants Alexander ("Alex") Ovalle, John Ovalle, Jr., Benito S. Canales, and Nicholas A. Garcia appeal their convictions on one count each of conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(a), (c), 846. Canales and Garcia also appeal their sentences. The appellants have raised a variety of challenges both to the evidence obtained by the police and the basis for their arrests. They have also challenged the selection of the grand jury that indicted them and the petit jury that convicted them. We will address only the jury selection claims as we find those determinative of the appellants' appeals.

## I. THE CRIMINAL ACTIVITY

The appellants were indicted with five other codefendants for involvement in a conspiracy to transport marijuana from Mexico to Texas, and then to other areas in North America, including Michigan. The prosecution presented evidence to show that the conspirators used tractor-trailers with hidden compartments to transport large quantities of marijuana and cash.

In late November and early December 1992, police officers in Saginaw, Michigan set up surveillance of an hotel room occupied by Alexander Ovalle and Benito Canales. On December 2, based in part on bits of conversation overheard by the officers, the police pulled over a Chevrolet Suburban occupied by Ovalle, Canales, Nicholas Garcia, Cruz Rodriguez, and Orville Dale Irwin. Each was patted down, handcuffed, and placed in a police car. The Suburban was later searched, yielding no drugs, but large quantities of cash, some of it wrapped in cellophane, some in a sock soaked with perfume, papers, power tools, and a large scale. The police later searched a tractor-trailer parked

at a hotel in Birch Run and found three thousand pounds of marijuana in a hidden compartment. John Ovalle, Jr., who lived in Saginaw (the other defendants lived in Texas) and is Alex Ovalle's uncle, was arrested eight days later.

The appellants were indicted along with Rodriguez and four other alleged co-conspirators. The other four resolved the charges against them before trial, and several of them testified at the trial with regard to their involvement in the conspiracy. Rodriguez was acquitted, while the appellants were convicted. John Ovalle, Jr. was sentenced to over thirty years in prison, and his nephew Alex was sentenced to seventeen years. Garcia and Canales received life sentences.

## II. THE JURY SELECTION PLAN

The appellants [1] contend that the administration of the Jury Selection Plan for the Eastern District of Michigan violates the Jury Selection and Service Act, 28 U.S.C. § 1861, et seq., their Sixth Amendment right to a jury representing a fair cross section of the community, and their right to equal protection under the laws as guaranteed by the Fifth Amendment Due Process Clause.[2]

Much of the focus on the appellants' objections to the jury selection process has been on the question of whether Hispanics were unconstitutionally underrepresented in the jury wheel in violation of the appellants' rights to a jury drawn from a fair cross section of the community and their right to equal protection. What has received less attention is what we now determine to be the controlling issue in this case: that in an effort to assure that African–Americans are fairly represented in the qualified jury wheel, *one in five non-African-Americans were se-*

*lected at random to be removed from the jury wheel simply because of their racial status.* See J.A. at 784–85 (92–AO–080 (requiring 877 White and Other Qualified Jurors to be removed randomly from the qualified jury wheel for Bay City)). We turn now to the administration of the jury selection plan in the Eastern District of Michigan.

On February 3, 1992, the judges of the United States District Court for the Eastern District of Michigan approved a Jury Selection Plan. See 92–AO–035. The purpose of the plan was to select grand and petit juries at random from a fair cross section of the community, and to assure that all citizens would have the opportunity to be considered for service on those juries. See 92–AO–035. The plan was subsequently approved by the Judicial Council of the Sixth Circuit on April 1, 1992. See 92–AO–035. Section VIII. B. of the Jury Selection Plan called for a "subtraction" method of balancing the jury wheel to ensure proportional representation of different cognizable groups in the community, whereby:

[t]he qualified jury wheel shall be composed of persons who represent a fair cross-section of the area of each place of holding court as set forth in Section III of this Plan. To this end, if the Court determines that a cognizable group of persons is substantially overrepresented in the qualified jury wheel, the Chief Judge shall order the Clerk to remove randomly a specific number of names so that the population of each cognizable group in the qualified wheel closely approximates the percentage of the population of each group in the area of each place of holding court, according to the most recently published national census report.

92–AO–035.[3] Several administrative orders were issued to implement the Jury Selection

---

**1.** Appellants John Ovalle, Jr. and Alexander Ovalle incorporated Canales's and Garcia's arguments in their appellate briefs by reference. Their ability to raise these issues on appeal is addressed in Part IV.

**2.** An equal protection claim against the federal government is analyzed under the Due Process Clause of the Fifth Amendment. As the Supreme Court has held "[e]qual protection analysis in the Fifth Amendment area is the same as that under the [Equal Protection Clause of the] Fourteenth Amendment." *Buckley v. Valeo,* 424 U.S. 1, 93,

96 S.Ct. 612, 669–70, 46 L.Ed.2d 659 (1976); *see also Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 217, 224, 115 S.Ct. 2097, 2107–08, 132 L.Ed.2d 158 (1995); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

**3.** We are unaware of any other district in the country that uses the subtraction method utilized in the Eastern District of Michigan. *See United States v. Greene,* 971 F.Supp. 1117, 1123

Plan, including the one in question in this case, 92–AO–080, filed on November 17, 1992.

Administrative Order 92–AO–080, signed by the chief judge of the district court, provided in pertinent part:

> IT APPEARING THAT the Black population, as reported in the 1990 census for the 21 counties for which the place of holding court is Bay City, is 4.2%, and
>
> IT FURTHER APPEARING THAT, as of November 4, 1992, the percentage of qualified Black jurors in the Bay City wheel created in 1992 is 3.45%,
>
> NOW, THEREFORE, IT IS ORDERED THAT, based on the information on the attached "Worksheet for the Removal of Jurors from the Qualified Bay City Jury Wheel," the Clerk of the Court shall remove by a random process the names of 877 White and Other Qualified Jurors from the 4,829 total qualified jurors in the 1992 wheel to bring it into compliance with the cognizable group requirements of Section VIII. B. of the Jury Selection Plan, approved on April 1, 1992, and the policy of the Court. As a result of this procedure, the 1992 qualified Bay City wheel shall be composed of 166 Black qualified jurors and 3,786 White and Other qualified jurors. A quotient of 5 and a starting number of 4 shall be used for the removal procedure.

J.A. at 784 (92–AO–080).

To understand fully the impact of the administrative order, it is necessary to review the procedures for establishing the qualified jury wheel in the Eastern District of Michigan. First, the district court gathers source lists, which include the voters' registration lists from the various cities, townships, and villages that make up the voting precincts within the Eastern District, and the drivers' license lists for the same area from the Michigan Secretary of State's office. Next, names are randomly selected from the source lists for the district's master jury wheel. Jury questionnaires are then sent to the individuals whose names were drawn from the master wheel to determine whether an individual is qualified for jury service. One of the questions regards an individual's race. The question reads as follows:

10. RACE

TO ASSIST IN ENSURING THAT ALL PEOPLE ARE REPRESENTED ON JURIES, PLEASE INDICATE WHICH OF THE FOLLOWING APPLIES TO YOU. NOTHING DISCLOSED WILL AFFECT YOUR SELECTION FOR JURY DUTY (SEE NOTE 10 ON REVERSE)

☐ BLACK ☐ AMERICAN INDIAN
☐ WHITE ☐ ASIAN
☐ OTHER (SPECIFY) _____
Are you Hispanic? ☐ Yes ☐ No

J.A. at 501 (Questionnaire). On the reverse side of the form, the explanatory comments for question 10 read:

> Question 10—RACE. Federal law requires you as a prospective juror to indicate your race. This answer is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service. By answering this question you help the federal court check and observe the juror selection process so that discrimination cannot occur. In this way the federal court can fulfill the policy of the United States which is to provide jurors who are randomly selected from a fair cross section of the community.

J.A. at 502 (Questionnaire).

During the relevant time period for this case, the responses to the questionnaire were opened and sorted upon receipt. If certain information was missing, the card was sent back to the candidate to be completed. Specifically, if the individual failed to indicate his or her race on the questionnaire, the card was returned. *See* J.A. at 1198–99 (Schmidt Test. at 63–64).[4] Evidence in the record also

---

(E.D.Mich.1997) (stating that "[n]o other court in the country uses the subtraction method").

**4.** If the individual failed to answer on the questionnaire whether he or she was Hispanic, the card was not considered incomplete and was therefore not returned to the individual for completion. *See* J.A. at 1199 (Schmidt Test. at 64).

The district court's jury administrator, Jeannie Schmidt, indicated that this was because "Hispanic is not considered a race." Schmidt Test. at 65 (R.569); *see also* Schmidt Test. at 67, 70 (R. 569). In fact, the JSSA prohibits a juror qualification form from requiring a potential juror to answer a question relating to that person's ethnic status. *See* 28 U.S.C. § 1869(h).

indicated that the court administrator considered the only cognizable group warranting any adjustment to be African–Americans, and that there had never been an adjustment for any other group. *See* Schmidt Test. at 67–69 (R. 549).

Well prior to voir dire examinations, appellant Canales filed a motion on April 20, 1993 for inspection of the grand jury and petit jury lists. *See* J.A. at 441 (Mot. for Inspection filed April 20, 1993). On April 26, 1993 he filed a motion to dismiss or for stay of the proceedings, *see* J.A. at 448 (Mot. to Dismiss), alleging that (1) the grand jury and the petit jury were not a fair cross section of the community; (2) Hispanics were systematically excluded from these juries; and (3) a district court administrative order discriminated against Hispanics by only recognizing African–Americans as a cognizable group worthy of special treatment. Canales also contended that the Eastern District's imposed method of redressing the underrepresentation of African–Americans on the juries deprived the appellants of the same opportunity to have Hispanics proportionally represented on the juries. Appellant Garcia joined Canales in filing a supplemental motion to dismiss or for stay of the proceedings on June 3, 1993. In this supplemental motion, the two appellants indicated that their jury selection claims were based on the Jury Selection and Service Act, 28 U.S.C. § 1861, et seq., the Sixth Amendment, and the Fifth Amendment. *See* J.A. at 460 (Supp. Mot. to Dismiss filed June 3, 1993). As part of the support for their claims, Garcia and Canales indicated that the administration of the Plan resulted in the "remov[al of] the names of 877 White and Other Qualified Jurors from the Qualified Jurors and 1992 Wheel [ ] in violation of my client's Fifth ... Amendment

Rights."[5] J.A. at 466 (Correa Aff. in Support of Supplemental Mot. to Dismiss filed June 3, 1993). At all times after this motion was filed, appellants Garcia and Canales jointly pursued dismissal on the grounds of the jury selection claims.

The district court held that the appellants had not carried their prima facie burden on any of their jury selection claims because they failed to show that Hispanics were significantly underrepresented. *See* J.A. at 617, 621 (Order and Op. of Dec. 10, 1993). The district court rejected the appellants' claims under the Sixth Amendment and the Fifth Amendment because the district court focused only on the issue of whether Hispanics were underrepresented. The district court's jury administrator did not have complete records on the Hispanic status of the qualified jury wheel. *See* J.A. at 1205 (Schmidt Test. at 89). The appellants had filed a motion prior to the district court's determination of the jury selection issues requesting the opportunity to review the juror cards in a manner that would allow them to contact some of the more than 2,900 juror candidates who had not answered the Hispanic-status question on the questionnaire. *See* J.A. at 468 (Mot. to Inspect filed June 3, 1993).

The district judge restricted the appellants' inspection of the list of qualified juror candidates by allowing a limited inspection of the 3952 questionnaires that remained in the jury wheel and prohibiting the appellants from contacting any of the individuals. *See* J.A. at 529 (Order of Aug. 24, 1993). This order prevented the appellants from ascertaining the degree of Hispanic representation in the jury wheel relative to the percentage of Hispanics in the community.[6] This decision was particularly important to

---

**5.** The evidence indicated, and is not disputed, that of the 4829 qualified juror responses, only 1886 answered the question regarding their Hispanic status, while 2943 did not answer whether or not they were Hispanic. *See* J.A. at 609 (Order and Op. of Dec. 10, 1993). Of the 1886 individuals who did answer the Hispanic question, only 60 identified themselves as Hispanic. *See id.* The evidence also showed that out of the 877 individuals removed pursuant to 92–AO–080, 14 of those individuals had indicated that they were Hispanic. *See* J.A. at 1206–07 (Schmidt Test. at 92–93).

**6.** Without the information indicating whether or not the non-reporting qualified members of the jury wheel are Hispanic, the appellants had no way of proving how many Hispanics were in the jury wheel. Without being able to survey the people who were in the qualified jury wheel, but had not answered the question regarding their Hispanic status, the appellants had no ability to establish more fully their claim.

the appellants because a showing of underrepresentation is necessary to establish a prima facie violation of the Sixth Amendment's fair cross-section requirement. *See Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979).[7] Because we believe that our analysis of the JSSA and Fifth Amendment claims discussed below adequately resolves the issues in this case, we make no ruling on the district court's decision regarding either the appellants' access to the Hispanic-status information or the district court's determination of the Sixth Amendment underrepresentation issue.

### III. THE JURY SELECTION AND SERVICE ACT CLAIM

Both appellants Canales and Garcia filed motions to dismiss under the Jury Selection and Service Act ("the JSSA" or "the Act"), 28 U.S.C. § 1861, et seq.[8] Appellants John Ovalle, Jr. and Alexander Ovalle first raised objections to the jury selection procedures in their direct appeal by incorporating by reference Canales's brief. *See* A. Ovalle's Br. at 10; J. Ovalle's Br. at 19. Appellant Canales originally filed a motion to dismiss on the basis of a JSSA violation on April 26, 1993. Appellant Garcia then joined Canales in filing a supplemental motion to dismiss or stay the proceedings on June 3, 1993. For the reasons detailed below, we consider only the JSSA claim of Canales.

■ Appellant Garcia's claims under the JSSA are time-barred.[9] Section 1867(a) requires a defendant to file a motion to dismiss based on a violation of the Act "within seven days after the defendant discovered or could

have discovered, by the exercise of diligence, the grounds therefor. . . ." 28 U.S.C. § 1867(a). As the Fifth Circuit indicated in *United States v. Bearden*, 659 F.2d 590, 595 (5th Cir.1981), *cert. denied*, 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982), "[t]his timeliness requirement was provided to prevent dilatoriness and to ensure the rapid disposition of claims, particularly those that are spurious. It is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act." *Id.* at 595 (citations omitted). *Accord United States v. Young*, 570 F.2d 152, 153 (6th Cir. 1978) (holding strict compliance with time limits of Act is required). In addition, *Bearden* went on to state that

> [w]here a defendant relies on a jury challenge motion filed by another defendant, the seven-day period provided in the Act for filing a motion begins to run from the date the defendant has knowledge or could have obtained knowledge of the earlier motion.

*Bearden*, 659 F.2d at 599.

Garcia's attempt to join Canales's Supplemental Motion to Dismiss or for Stay of the Proceedings is untimely. Canales filed his original Motion to Dismiss on April 26, 1993. *See* J.A. at 448 (Canales's Mot. to Dismiss or Stay). Canales's counsel served the motion on Garcia's counsel at this time, *see* J.A. at 453–54 (Proof of Service filed April 20, 1993), yet Garcia did not attempt to join this effort until June 3, 1993, after more than one month had passed. *See* J.A. at 468 (Am. Mot. for Inspection). This clearly exceeds the seven-day limit contained in 28 U.S.C. § 1867(a). Canales's original motion put

---

7. In order to establish a violation of this right, a defendant must show:
 (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 *Duren*, 439 U.S. at 364, 99 S.Ct. at 668.

8. We were unable to find any written ruling by the district court judge on the JSSA claim. Had the district court found a substantial violation of the JSSA, it would have been required to stay the

proceedings until a properly selected grand or petit jury was selected. *See* 28 U.S.C. § 1867(d). For the purposes of this opinion we will treat the issue as if the district court found no substantial violation of the JSSA.

9. The government in a brief filed in the district court suggests that Canales's JSSA claim is also time-barred. We found no evidence in the record suggesting that Canales's claim would be time-barred. Additionally, that issue would not be determinative of Canales's appeal, as our determination of Canales's Fifth Amendment claim would also result in reversal of his conviction.

Garcia on notice, thereby triggering the seven-day time period. Garcia's failure to file within that seven-day window bars him from raising his claim under the JSSA. *See United States v. Tarnowski*, 583 F.2d 903, 904 n. 1 (6th Cir.1978) (holding that defendant's failure to raise timely objection as required by the 28 U.S.C. § 1867(a) precludes him from raising a JSSA claim, even though his codefendant timely raised the objection), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979); *see also Bearden*, 659 F.2d at 600 (same). For the same reason, both of the Ovalles are barred from raising the JSSA claim as they did not attempt to raise this claim until their direct appeal, more than two years after Canales's motion put them on notice.[10] Because the Ovalles have failed to meet the seven-day deadline, we hold that they too are barred from raising any claim under the JSSA.

 ■ We now turn to Canales's claim under the JSSA. Typically, challenges brought under the JSSA are reviewed under the same standard as a Sixth Amendment claim of denial of a jury representing a fair cross section of the community, which requires a showing of underrepresentation of a distinct group. *See, e.g., United States v. Ireland*, 62 F.3d 227, 231–32 (8th Cir.1995); *United States v. Miller*, 771 F.2d 1219, 1227 (9th Cir.1985). This is justified because the purpose of the Sixth Amendment and the Act, and § 1861 in particular, is to entitle litigants in federal court to "the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

 ■ Although most courts reviewing a JSSA claim have required a showing of underrepresentation, such a showing is unnecessary in this case. The customarily required showing of underrepresentation is one of three elements with which a litigant may establish a prima facie case of a JSSA viola-

tion. Such a prima facie case creates a presumption of intentional discrimination which may then be rebutted by the Government. *See, e.g., United States v. Perez–Hernandez*, 672 F.2d 1380, 1387 (11th Cir.1982) ("[t]he central focus of a rebuttal case must be on a 'showing that racially neutral selection procedures have produced the disparity' ") (quoting *Alexander v. Louisiana*, 405 U.S. 625, 631–32, 92 S.Ct. 1221, 1225–26, 31 L.Ed.2d 536 (1972)). The element of underrepresentation as a part of the customary prima facie case is one route, the indirect evidence route, to showing a JSSA violation. Another avenue is the one taken here, whereby a litigant may demonstrate a JSSA violation with direct evidence. *Cf. Thiel v. Southern Pac. Co.*, 328 U.S. 217, 221–225, 66 S.Ct. 984, 986–88, 90 L.Ed. 1181 (1946) (finding unconstitutional exclusion of identifiable group from venire based on direct testimonial evidence of court clerk and jury commissioner). "Inferential assistance from statistical analysis is not necessary where the harm of exclusion can be shown directly, as it has been here." *Atwell v. Blackburn*, 800 F.2d 502, 509 (5th Cir.1986) (Goldberg, J., dissenting) (discussing prima facie case and burden of proof for a fair cross-section claim).

 Additionally, "[t]he plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quotations omitted). Section 1862 of the JSSA clearly states that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States ... on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862. The plain meaning of this section is a clear prohibition of discrimination in the selection of grand and petit juries.[11] *See, e.g., United States v.*

---

10. The Ovalles' JSSA claims would also be barred by another provision contained in 28 U.S.C. § 1867(a) which requires that any such motions be filed prior to the voir dire examinations at the latest. *See* 28 U.S.C. § 1867(a).

11. In *Peters v. Kiff*, 407 U.S. 493, 506, 92 S.Ct. 2163, 2170, 33 L.Ed.2d 83 (1972), six of the Justices agreed in two opinions that an earlier statute almost identical in wording to § 1862 prohibited the systematic exclusion of citizens from jury service based on their race. *See id.* at 505, 92 S.Ct. at 2169–70 (plurality opinion)

*Percival,* 756 F.2d 600, 613 (7th Cir.1985); *Perez–Hernandez,* 672 F.2d at 1385; *United States v. Brummitt,* 665 F.2d 521, 528 (5th Cir.1981), *cert. denied,* 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852 (1982); *United States v. Brady,* 579 F.2d 1121, 1131 (9th Cir.1978). This prohibition is consistent with the purpose of the JSSA, which was passed to ensure that juries would represent a fair cross section of the community and that "all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States." 28 U.S.C. § 1861.

No party to this case disputes the fact that, although initially selected at random, at least 14 Hispanics and 863 other individuals were removed from the jury wheel for the sole reason that they were not African–Americans. By subtracting potential jurors from the master wheel on the sole basis of their racial status, the Jury Selection Plan violates § 1862.

■ The mere fact that there has been a violation of the JSSA does not guarantee Canales a remedy. The JSSA "only provides a remedy for substantial failures to comply with its provisions." *See United States v. Calabrese,* 942 F.2d 218, 227 (3rd Cir.1991); *see also* 28 U.S.C. § 1867(d). Rather than clarifying the term "substantial" in the JSSA, Congress left the task of defining this term to the discretion of the courts. *See* H.R.REP. No. 90–1076 (1968) *reprinted in* 1968 U.S.C.C.A.N. 1792, 1794 ("Your committee would leave the definition of 'substantial' to the process of judicial decision."). As the Third Circuit has stated, "In determining whether a violation is substantial, the alleged violations must be weighed against the underlying principles of the Act." *Calabrese,* 942 F.2d at 227 (quotation omitted). The exclusion of non-African-American potential jurors merely because of their racial status is contrary to a central purpose of the JSSA— the elimination of discrimination in the selection of jurors. We therefore hold that the Jury Selection Plan is in substantial violation

of the JSSA and that Canales's conviction must be reversed and the case of appellant Canales must be remanded to the district court to permit a retrial with a properly selected jury. *See id.* at 230; *United States v. Nelson,* 718 F.2d 315, 318 (9th Cir.1983).

Generally, our analysis would end here as we have held the Jury Selection Plan to be in violation of the statute and "[i]t is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482 (1905); *see also Watters v. TSR, Inc.,* 904 F.2d 378, 380 (6th Cir.1990). Canales and Garcia also raised an objection to the Jury Selection Plan based on the Fifth and Sixth Amendments, however, and the Ovalles raised these arguments on appeal. Because Garcia and the Ovalles cannot rely on our statutory disposition of Canales's JSSA claim, we now turn to the constitutional issues raised in this case.

## IV. THE FIFTH AMENDMENT CLAIM

■ As indicated in the discussion of the facts and procedural history of this case, much of the focus at the lower court level was on whether Hispanics were treated differently than other cognizable groups. We believe, however, that the proper focus is on whether non-African-Americans were eliminated from the qualified jury wheel based solely on their racial status in violation of the right to equal protection guaranteed by the Fifth Amendment. We review a challenge to the composition of grand and petit juries de novo. *See United States v. Sanchez–Lopez,* 879 F.2d 541, 546 (9th Cir.1989).

### A. THIRD–PARTY STANDING

Before addressing the merits of the appellants' Fifth Amendment claim, we must first determine whether the appellants have standing to raise this claim. Generally, "a litigant must assert his or her own legal

(Marshall, Douglas, Stewart, JJ.); *id.* at 505–06, 92 S.Ct. at 2169–70 (White, Brennan, Powell, JJ., concurring in the judgment). The statute in question, 18 U.S.C. § 243, states in pertinent part that "[n]o citizen possessing all other quali-

fications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude."

rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991). The Supreme Court, however, has recognized limited exceptions to this requirement when three criteria are met:

> The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Id.* at 411, 111 S.Ct. at 1370–71 (citations omitted). The Supreme Court has found these criteria to have been satisfied in cases where the Court "permitted criminal defendants to challenge their convictions by raising the rights of third parties." *Id.* at 411, 111 S.Ct. at 1371 (citing *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

In *Powers*, the Supreme Court addressed directly the issue of whether a criminal defendant had third-party standing to raise the equal protection rights of jurors who had allegedly been excluded on the basis of race by the use of a prosecutor's peremptory challenges. There a white defendant had raised a claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (allowing an African–American defendant to challenge the discriminatory use of peremptory challenges by prosecutor against potential African–American jurors), alleging that the rights of African–American potential jurors were violated by the peremptory challenges of the prosecution directed against African–Americans. The Court found that the defendant had standing because the three criteria were met. *See Powers*, 499 U.S. at 415, 111 S.Ct. at 1373.

Turning to the first prong of the test, "injury in fact," the Court in *Powers* found that a criminal defendant has an interest in "neutral jury selection procedures." *Powers*, 499 U.S. at 411, 111 S.Ct. at 1371 (citing *Allen v. Hardy*, 478 U.S. 255, 259, 106 S.Ct. 2878, 2880–81, 92 L.Ed.2d 199 (1986)). This is "because racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process, and places the fairness of a criminal proceeding in doubt." *Powers*, 499 U.S. at 411, 111 S.Ct. at 1371 (quotations omitted). As the Court noted:

> The jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors. The intrusion of racial discrimination into the jury selection process damages both the fact and the perception of this guarantee. Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, or predisposition about the defendant's culpability.
>
> . . . .
>
> The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair. The verdict will not be accepted or understood in these terms if the jury is chosen by unlawful means at the outset. Upon these considerations, we find that a criminal defendant suffers a real injury when the prosecutor excludes jurors at his or her own trial on account of race.

*Id.* at 411–13, 111 S.Ct. at 1371–72 (quotations and citations omitted).

Turning to the second prong, "close relationship," the Court reiterated its holding in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), "that in certain circumstances 'the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.'" *Powers*, 499 U.S. at 413, 111 S.Ct. at 1372 (quoting *Singleton*, 428 U.S. at 115, 96 S.Ct. at 2874–75). In *Powers*, the Court found that the relationship between the defendant and potential jurors was "as close as, if not closer than, those we have recognized to convey third-party standing in our prior cases." *Powers*, 499 U.S. at 413, 111 S.Ct. at 1372. The Court focused on the strong "con-

gruence of interests" shared by the potential jurors and the defendant. *Id.* at 414, 111 S.Ct. at 1372–73. Both the defendant and the excluded jurors had an interest in eliminating racial discrimination in the selection of jurors, and both had an interest in a jury selection system that upheld the integrity of the judicial system. *See id.* at 413, 111 S.Ct. at 1372. A jury selection plan that discriminates based on race harms not only the defendants, but also "the excluded jurors and the community at large." *Id.* at 406, 111 S.Ct. at 1368 (citing *Batson,* 476 U.S. at 87, 106 S.Ct. at 1718). Additionally, the "close relationship" prong is satisfied by the fact that the defendants "will be a motivated, effective advocate for the excluded" potential jurors' rights. *Id.* at 414, 111 S.Ct. at 1372. As the Court noted:

> Petitioner has much at stake in proving that his jury was improperly constituted due to an equal protection violation, for we have recognized that discrimination in the jury selection process may lead to the reversal of a conviction. Thus, there seems little loss in terms of effective advocacy from allowing [the assertion of this claim] by the present jus tertii champion.

*Id.* at 413–14, 111 S.Ct. at 1372 (quotations omitted).

Finally, the Court in *Powers* turned to the issue of whether the third parties involved were likely or had the ability to assert their own rights. The Court acknowledged "that individual jurors subjected to racial exclusion have the legal right to bring suit on their own behalf." *Id.* at 414, 111 S.Ct. at 1372. The Court went on to acknowledge that "[a]s a practical matter, however, these challenges are rare." *Id.* at 414, 111 S.Ct. at 1372 (citing ALBERT W. ALSCHULER, *The Supreme Court and the Jury: Voir Dire Peremptory Challenges, and the Review of Jury Verdicts,* 56 U. CHI. L.REV. 153, 193–195 (1989)).[12]

The Court found that there were several barriers preventing excluded jurors from asserting their own equal protection rights in the case of peremptory challenges. The Court noted that a potential juror's challenge

of a prosecutor's abuse of the peremptory challenge is "[u]nlike a challenge to systematic practices of the jury clerk and commissioners such as we considered in *Carter [v. Jury Comm'n of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970)], [because] it would be difficult for an individual juror to show a likelihood that discrimination against him at the voir dire stage will recur." *Powers,* 499 U.S. at 415, 111 S.Ct. at 1373 (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 105–110, 103 S.Ct. 1660, 1666–70, 75 L.Ed.2d 675 (1983)). The Court also focused, however, on the unlikelihood of a potential juror having an opportunity to be heard on the matter and on the lack of incentive for a juror to bring such a claim. As the Court noted, "[p]otential jurors are not parties to the jury selection process and have no opportunity to be heard at the time of their exclusion." *Id.* at 414, 111 S.Ct. at 1373. Additionally, "there exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation." *Id.* at 415, 111 S.Ct. at 1373.

## B. THE APPELLANTS' STANDING

■ Turning to the present case, we hold that the appellants have satisfied the test for third-party standing with respect to raising an equal protection challenge to the Jury Selection Plan for the Eastern District of Michigan. First, as the Supreme Court in *Powers* held, "the intrusion of racial discrimination into the jury selection process damages both the fact and the perception of" the defendant's guarantee of a fair trial. *Powers,* 499 U.S. at 411, 111 S.Ct. at 1371. This is no less true when the discrimination takes place in the selection of the qualified jury wheel as when it takes place during voir dire. "[T]he reason a defendant is allowed to contest discrimination in the selection of a grand jury is to protect the appearance of justice and the integrity of our judicial system. 'Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby

---

12. As the Court noted, "it took nearly a century after the Fourteenth Amendment and the Civil Rights Act of 1875 came into being for the first such case to reach this Court." *Powers,* 499 U.S. at 414, 111 S.Ct. at 1372–73.

casts doubt on the integrity of the judicial process.'" *Perez–Hernandez*, 672 F.2d at 1388 (Morgan, J., concurring) (quoting *Rose v. Mitchell*, 443 U.S. 545, 555–56, 99 S.Ct. 2993, 2999–3000, 61 L.Ed.2d 739 (1979)). As stated in *Peters v. Kiff*, "[i]llegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process." 407 U.S. at 502, 92 S.Ct. at 2168 (plurality opinion). When the government's jury selection plan discriminates against an identifiable group of citizens, both the defendant and those citizens who are excluded suffer an injury in fact—the defendant is denied "neutral jury selection procedures" and the excluded citizens are denied an opportunity to participate in an important civic requirement. *See Allen*, 478 U.S. at 259, 106 S.Ct. at 2880–81; *Powers*, 499 U.S. at 406–07, 411, 111 S.Ct. at 1368–69, 1370–71.

Second, there exists a sufficiently close relationship between the appellants and the excluded jurors so as to satisfy the second prong of the third-party standing test. The Court noted in *Powers* that "[v]oir dire permits a party to establish a relation, if not a bond of trust, with the jurors. This relation continues throughout the entire trial and may in some cases extend to the sentencing as well." *Powers*, 499 U.S. at 413, 111 S.Ct. at 1372. It may be suggested that *Powers* is distinguishable from the present case because there was never any contact between the appellants and the excluded jurors. We reject such a limited interpretation of *Powers*. Although *Powers* noted the importance of voir dire, the Court's focus was on the strong "congruence of interests" shared by the potential jurors and the defendant, not the fact that they occupied the same room. *See id.* at 413–14, 111 S.Ct. at 1372–73. The Court stated that it is the "excluded juror['s] and the criminal defendant['s] ... common interest in eliminating racial discrimination from the courtroom" that "makes it necessary and appropriate for the defendant to raise the rights of the juror." *Id.* at 413–14, 111 S.Ct. at 1372. As in *Powers*, both the appellants and excluded jurors in this case have an interest in eliminating racial discrimination in the selection of juries.

Although a venireperson excluded from jury service because of race may suffer a heightened sense of personal humiliation, *see id.*, the key to the relationship between the appellants and the potential jurors for standing purposes is "their respective roles as an accused, on the one hand, and a prospective arbiter of justice on the other. Although that relationship may become most concretely evident once the courtroom drama opens, it is a relationship which begins when the defendant is first accused by charge or indictment and the prospective juror is first qualified for the Jury Wheel." *Greene*, 971 F.Supp. at 1135–36. There is nothing magical about the fact that a potential juror has walked through the courtroom doors. The fact that they are both participants in the same judicial process, with a common interest in eliminating discrimination in the selection of the jurors, is what satisfies *Singleton*'s requirement that "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." 428 U.S. at 115, 96 S.Ct. at 2874–75; *see also Greene*, 971 F.Supp. at 1135–36. As District Judge Rosen stated when considering standing in a similar case:

> To draw a distinction at the courtroom door, or at the jury box, ignores the realities of the litigation process and the roles of the defendant and the jury. Just as, for standing purposes, a defendant has a relationship with the court as an institution, so, too, does that relationship extend to those who would be selected as the ultimate judge of the defendant's guilt or innocence. It is the role that the prospective juror plays in the justice system that defines the relationship, not merely the fact that the prospective juror was in the courtroom with the Defendant and participating in voir dire.

*Greene*, 971 F.Supp. at 1136.

Finally, turning to the third prong of the standing test, it is unlikely that the potential jurors who were excluded based on race will bring an equal protection claim, or that they will have the ability to do so. As in *Powers*, the excluded potential jurors had no opportu-

nity to be heard at the time of their exclusion because in this case they were never even notified of their elimination from the jury wheel. Moreover, the excluded potential jurors face the same daunting barriers of the "small financial stake" and the "economic burdens of litigation" as the potential jurors in *Powers. Powers,* 499 U.S. at 415, 111 S.Ct. at 1373.

For the reasons stated above, we hold that a defendant in a criminal case can raise the equal protection rights of individuals excluded from the jury wheel because of their race. This holding is consistent with "a course of decisions of long standing directed against racial discrimination in the administration of justice." *Cassell v. Texas,* 339 U.S. 282, 290, 70 S.Ct. 629, 633, 94 L.Ed. 839 (1950) (Frankfurter, J., concurring in judgment); *see also Powers,* 499 U.S. at 415, 111 S.Ct. at 1373.

## C. THE APPLICABLE EQUAL PROTECTION STANDARD

■ We begin with the proposition that the Fifth Amendment's mandate that "race discrimination be eliminated from all official acts and proceedings of the [federal government] is most compelling in the judicial system." *Powers,* 499 U.S. at 415, 111 S.Ct. at 1373 (citing *Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 2999–3000, 61 L.Ed.2d 739 (1979)).[13] Here, the appellants allege that the jury selection process violated their right to equal protection under the laws as guaranteed by the Fifth Amendment.[14]

Traditionally, in order to establish a prima facie case that a jury was selected in violation of a defendant's right to equal protection, the defendant is required to meet a three-part test established by the Supreme Court in *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). "First, he must establish that the group excluded from the grand jury is one that is a recognizable, distinct class capable

of being singled out for different treatment under the laws. Second, he must establish that the selection procedure used by the state to select grand juries is susceptible to abuse or is not racially neutral. Finally, he must establish the degree of underrepresentation occurring over a significant period of time by comparing the proportion of the excluded group in the total population to the proportion serving as grand jurors." *Jefferson v. Morgan,* 962 F.2d 1185, 1188–89 (6th Cir.) (citations omitted), *cert. denied,* 506 U.S. 905, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). "Once [a defendant] has established a prima facie case, the burden shifts to the state to rebut the inference of intentional discrimination." *Id.* at 1189 (citing *Castaneda,* 430 U.S. at 495, 97 S.Ct. at 1280–81).

While the above described requirements comprise the commonly utilized evidentiary route for an equal protection challenge to a jury's selection, that is only one of two possible evidentiary scenarios, as we described earlier when addressing the burden of proof in relation to JSSA claims. *See Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280 (describing the showing of underrepresentation as a "method of proof" and a "method of proving discrimination" and outlining shifting burden of proof on the issue on discrimination). As the Sixth Circuit has previously indicated, the rationale underlying the third prong "is that if a disparity is sufficiently large over a significant period of time, then it is unlikely that the disparity is due solely to chance or to accident, and in the absence of evidence to the contrary, a court should conclude that racial or other class-related factors entered into the selection process." *Jefferson,* 962 F.2d at 1189 (citing *Castaneda,* 430 U.S. at 495 n. 14, 97 S.Ct. at 1280 n. 14). This rationale suggests that if there is no doubt that racial factors were the primary reason for excluding potential jurors, there would be no need to utilize the traditional three-prong

---

**13.** Although *Powers* and *Rose* were referring to the Fourteenth Amendment, the claim is no less true when the action in question is that of the federal government and where the Fifth Amendment, rather than the Fourteenth Amendment, is controlling. The same governing principles apply to the equal protection analysis under either amendment. *See* n.2 *supra.*

**14.** Although they invoke both the Fifth and Fourteenth Amendments, appellants' claims are based on federal government action, not the action of a state, and are thus governed by the Fifth Amendment.

approach; a court could simply look to the direct evidence of exclusion based on race. This alternative scenario involving direct evidence is the nature of the proof presented in this case.

 Recent Supreme Court decisions have also put in question the necessity of a plaintiff demonstrating all three prongs. In its more recent pronouncements on laws based on racial classifications, the Supreme Court has started "from the premise that '[l]aws that explicitly distinguish between individuals on racial grounds fall within the core of [the Equal Protection Clause's] prohibition.'" *Miller v. Johnson,* 515 U.S. 900, 905, 115 S.Ct. 2475, 2483, 132 L.Ed.2d 762 (1995) (quoting *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993)). Such laws "cannot be upheld unless they are narrowly tailored to achieving a compelling state interest." *Miller,* 515 U.S. at 904, 115 S.Ct. at 2482 (citing *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 229–30, 115 S.Ct. 2097, 2113–14, 132 L.Ed.2d 158 (1995)); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (plurality opinion); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 280, and n. 6, 106 S.Ct. 1842, 1847 and n. 6, 90 L.Ed.2d 260 (1986) (plurality opinion). "This is true whether or not the reason for the racial classification is benign or the purpose remedial." *Shaw v. Hunt,* 517 U.S. 899, ——, 116 S.Ct. 1894, 1900, 135 L.Ed.2d 207 (1996).

In reviewing the recent Supreme Court precedent with respect to laws based on racial classification as well as the Court's holdings regarding racial discrimination in the selection of jurors, we are led to the inevitable conclusion that when race is the predominant factor in excluding certain individuals from the jury wheel there must be a compelling governmental interest for such action and the means chosen must be narrowly tailored to meet that interest. This should not be read as indicating that we are rejecting *Castaneda*'s traditional three-prong approach to equal protection challenges to jury selection procedures. If there is a dispute as to whether race was a predominant

factor in the exclusion of certain jurors, then the burden is on the challenger to the system to meet the *Castaneda* three-prong test. In cases where it is not disputed that jurors were systematically excluded based predominantly on racial reasons, we will proceed directly to a determination of whether there is a compelling governmental interest for the plan and whether the means chosen are narrowly tailored to meet that end.

## D. APPLYING THE STANDARD

 We now turn to an application of this standard to the Jury Selection Plan for the Eastern District of Michigan. The implementation of the jury selection plan is clearly not race neutral. Individuals were eliminated from consideration for jury service on the basis of their race. Any non-African-American had a chance of being eliminated from the jury wheel solely based on race. Additionally, as noted above,[15] at the time of the selection of the jury wheel relevant to the appellants' cases, a random list of non-African-Americans was removed from the jury wheel. Excluding non-African-Americans in this manner discriminates against potential jurors solely because of their racial status.

Because the administration of the plan is not race neutral, we now move on to determine whether there is both a compelling governmental interest for the plan and, if so, whether the means chosen to achieve that interest are narrowly tailored. The Jury Selection Plan here arguably was adopted in an effort to achieve a compelling governmental interest. The purpose of the plan was to select grand and petit juries at random from a fair cross section of the community, and to assure that all citizens would have the opportunity to be considered for service on those juries. *See* 92–AO–035.

The government has a compelling interest in ensuring that jury pools represent a fair cross section of the community. The Supreme Court, while holding that a defendant has no right to a "petit jury composed in whole or in part of persons of [the defendant's] own race," *Strauder v. West Virginia,* 100 U.S. 303, 305, 25 L.Ed. 664 (1880), has

---

**15.** *See* Part III (discussing Canales's JSSA claim).

indicated that there is a strong governmental interest in a jury pool that represents a fair cross section of the community. In *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940), the Supreme Court stated that a jury must be "a body truly representative of the community." *Id.* at 130, 61 S.Ct. at 165. In *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Court held that "[t]he presence of a fair cross section of the community on venires, panels, or lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions." *Id.* at 526, 530, 95 S.Ct. at 696, 697–98. The *Taylor* Court went on to hold that "the broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility." *Id.* at 530–31, 95 S.Ct. at 697–98 (quotations omitted). In *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 227, 66 S.Ct. 984, 989, 90 L.Ed. 1181 (1946), the Court held that "[t]rial by jury presupposes a jury drawn from a pool broadly representative of the community." *Id.* at 227, 66 S.Ct. at 989. The Court has also "perceived an important societal value in assuring diversity of representation on grand and petit juries." *Hobby v. United States,* 468 U.S. 339, 343, 104 S.Ct. 3093, 3095, 82 L.Ed.2d 260 (1984) (citing *Peters,* 407 U.S. at 503–04, 92 S.Ct. at 2168–69). Given the requirements of the Sixth Amendment and the importance of both the reality and the appearance of fairness in our criminal justice system, creating a jury pool that represents a fair cross section of the community is a compelling governmental interest.

The Jury Selection Plan adopted by the Eastern District of Michigan, however, is not narrowly tailored to meet this end. First, although one purpose of the plan is to ensure that all citizens have an opportunity to be considered for service on grand and petit juries, clearly the one-in-five white or other jurors eliminated from this qualified jury wheel did not have the same opportunity to serve as did the African–American members of the wheel who were protected from elimination. Second, although the government contends that the Jury Selection Plan is designed to create a jury wheel that represents a fair cross section of the community, the plan is not designed in such a way to ensure that a fair cross section of the community is represented in the qualified jury wheel. The plan does not even attempt to assure that Hispanics or any other cognizable group except for African–Americans are appropriately represented on the jury wheel. *See* Schmidt Test. at 67–69 (R. 549). There is certainly no effort to ensure that Hispanics are properly represented. While forms are returned to potential jurors if they did not self-identify as African–American, white, Asian–American or Native–American, the forms were not sent back if the Hispanic-status question was not answered. *See* J.A. at 1199 (Schmidt Test. at 64). Indeed, on the basis of those who did answer the Hispanic-status question in this case, we know that at least fourteen Hispanics were removed from the jury wheel on the basis of their "white race" in an effort to promote a "more balanced" wheel. *See* J.A. at 1206–07 (Schmidt Test. at 92–93). It is difficult to understand how the government can justify this plan as narrowly tailored to meeting a goal of a representative jury wheel when it does not even concern itself with any other cognizable group other than African–Americans.

The government suggests that there is no proof that any group is underrepresented in the ultimate jury wheel so as to create an equal protection violation. That is not the point. The problem is the removal of persons from the jury wheel solely on the basis of race. Rather than affirmatively removing otherwise qualified jurors because of their racial status, alternative methods of broadening membership in the jury pool could have been utilized. The Eastern District of Michigan could have chosen to supplement the voters' list and drivers' license list to diversify the pool of potential jurors. Such measures can establish a jury pool that represents a fair cross section of the community without unconstitutionally discriminating against individuals by eliminating them from the jury wheel simply on the basis of their racial status. What is not permitted is the exclusion of potential jurors for the sole reason that they are not African–American, ab-

sent a showing that such exclusion is a narrowly-tailored remedy to meet a compelling governmental interest.

The selection of the grand and petit juries from a qualified jury wheel that was derived through racially discriminatory means, and the fact that the Jury Selection Plan was not narrowly tailored to meet any compelling governmental interest, constitute grounds for reversal of the defendants' convictions. *Cf. Gomez v. United States*, 490 U.S. 858, 876, 109 S.Ct. 2237, 2248, 104 L.Ed.2d 923 (1989); *Batson*, 476 U.S. at 85, 106 S.Ct. at 1716–17; *Peters*, 407 U.S. at 505, 92 S.Ct. at 2169–70; *Hill v. Texas*, 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559 (1942) ("Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand because the Constitution prohibits the procedure by which it was obtained.")

## V. APPELLANTS' ENTITLEMENT TO RELIEF

We now turn to whether all of the appellants are entitled to relief. Only appellants Canales and Garcia raised any objection to the Jury Selection Plan at the district court level. Federal Rule of Criminal Procedure 12(b)(2) provides that "[d]efenses and objections based on defects in the indictment · or information ..." must be raised prior to trial. Federal Rule of Criminal Procedure 12(b)(2) governs an untimely claim of discrimination in the selection of the grand jury, "even when such challenges are on constitutional grounds." *Davis v. United States*, 411 U.S. 233, 238, 93 S.Ct. 1577, 1581, 36 L.Ed.2d 216 (1973) (citing *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963)). "Challenges of the petit jury are treated the same as challenges of the grand jury." *United States v. Hearst*, 638 F.2d 1190, 1196 (9th Cir.1980) (citing *Shotwell Mfg. Co.*, 371 U.S. at 362, 83 S.Ct. at 460–61), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981).

Failure to raise an objection to· the selection of the grand or petit jury prior to trial "shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." FED.R.CRIM.P. 12(f); *see also United States v. Oldfield*, 859 F.2d 392, 396 (6th Cir.1988). After reviewing the entire record, we find no evidence to suggest that appellants John or Alexander Ovalle raised any objection to the Jury Selection Plan prior to their trial and thus they have waived any objection to the selection of their grand or petit juries. We now turn to the question of whether there has been any cause shown to enable us to grant relief under Federal Rule of Criminal Procedure 12(f).

This court has previously held that relief from the Rule 12(b)(2) requirements is only appropriate where the district court has made a finding of "cause and actual prejudice." *Oldfield*, 859 F.2d at 397. The Ovalles have not suggested any cause for their failure to raise their jury selection claims prior to the time of trial. Even assuming that cause could be shown, the Ovalles would still not be able to demonstrate actual prejudice. The Ovalles may be inclined to argue that no showing of prejudice is required based on the Supreme Court's holding in *Peters v. Kiff*, which indicates that prejudice is presumed when there is an allegation of racial discrimination in the grand jury composition. *See Peters*, 407 U.S. at 504, 92 S.Ct. at 2169 (plurality opinion).[16] However, in *Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), the Supreme Court held that "[t]he presumption of prejudice which supports the existence of the right is not inconsistent with a holding that actual prejudice must be shown in order to obtain relief from a statutorily provided waiver for failure to assert it in a timely manner." *Id.* at 245, 93 S.Ct.· at 1584. On this basis, the Supreme Court upheld the district court's denial of the defendant's claims of discrimination in the selection of the grand jury that indicted him in violation of the Fifth Amendment based on the waiver provision of Rule 12(b)(2).

16. *Peters* addressed the issue of whether a white person had a substantive right to reversal of his conviction upon proof that African–Americans had been systematically excluded from the state grand and petit juries that indicted and tried him. *See Peters*, 407 U.S. at 496–97, 92 S.Ct. at 2165–66 (plurality opinion).

■ We apply this same standard to the Ovalles' untimely claim. As mentioned above, at no time prior to trial did either of the Ovalles raise a claim that either the grand jury or the petit jury was selected in violation of the Constitution. Indeed, the Ovalles did not raise such a claim until the trial was completed and they began their direct appeal. Neither of the Ovalles ever made a showing of actual prejudice or other cause for not raising their constitutional challenges to the jury selection plan prior to the start of the trial. Based on Federal Rules of Criminal Procedure 12(b)(2) and 12(f), we generally would decline to entertain the Ovalles' objections on appeal to the selection of the grand jury and the petit jury.[17] See United States v. Crismon, 905 F.2d 966, 969 (6th Cir.1990).

This Court has, however, recognized a narrow exception to Federal Rules of Criminal Procedure 12(b)(2) and 12(f) with respect to issues properly raised by codefendants. See United States v. Cassity, 631 F.2d 461, 465–66 (6th Cir.1980). In Cassity, we held that codefendants could raise on appeal the issue of whether certain evidence should have been suppressed because their codefendant had raised this issue below. We reasoned that the purpose of the pretrial motion rule is to eliminate interruptions in "the course of the trial for such auxiliary inquiries [because they] impede[ ] the momentum of the main proceeding and break[ ] the continuity of the jury's attention." Id. at 465 (quoting Nardone v. United States, 308 U.S. 338, 342, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)). Additionally, we reasoned that "a pre-trial decision whether the challenged evidence is admissible gives the Government the time and

flexibility to change its theory of the case, to develop or place greater reliance upon untainted evidence or otherwise to modify its trial strategy in response to an adverse ruling." Id. The codefendant's motion in Cassity timely raised the issue of suppression, the trial court had an opportunity to address the issue, and had the district court granted the codefendant's motion, "the remaining defendants presumably would have filed similar motions." Id. at 466. On this basis, we determined that "[w]here the [pretrial motion] rule's underlying policy is not implicated, its technical requirements should not be allowed to prevail over constitutional rights." Id. at 465; cf. United States v. Lefkowitz, 284 F.2d 310, 312 n. 1 (2nd Cir.1960) (Friendly, J.) (allowing defendant to appeal erroneous instruction regarding burden of proof in criminal case where only codefendant had objected at trial).

The appeals by John and Alexander Ovalle present a similar situation. Objections to the seating of the grand or petit jury must be filed before trial under Federal Rule of Criminal Procedure 12(b)(2). See Davis, 411 U.S. at 238–39, 93 S.Ct. at 1580–81; Shotwell Mfg. Co., 371 U.S. at 362, 83 S.Ct. at 460–61. "The purpose of the rule undoubtedly was to prevent the diversion of a trial by protracted excursions into preliminary matters at a time when the witnesses and jurors were kept waiting in the courtroom or its environs." United States v. Hoffa, 349 F.2d 20, 49 (6th Cir.1965), aff'd, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The fact that codefendants Canales and Garcia timely raised the identical issues in the court below means that the trial court had an opportunity to address the issues, and any defects in the jury selec-

---

17. Additionally, it is a rule of long standing of this court that we will not reverse on grounds not raised in the trial court. United States v. Broadus, 7 F.3d 460, 463 (1993); see generally United States v. McDowell Contractors, Inc., 668 F.2d 256, 257 (6th Cir.1982) ("It is this Court's inveterate rule not to reverse on grounds not raised in the district court."). By failing to object to the jury selection system at the district court level, the Ovalles have forfeited their opportunity to raise the challenge on appeal. See, e.g., Peretz v. United States, 501 U.S. 923, 936–37, 111 S.Ct. 2661, 2669–70, 115 L.Ed.2d 808 (1991) (stating that even the most basic rights of criminal defendants are subject to waiver and citing an array of

cases where fundamental rights were not preserved for appeal); Yakus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited·in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."). The only exception to this rule is when the error falls under the "plain error" rule of Federal Rule of Criminal Procedure 52(b). See generally United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993).

tion process could have been considered at that time. Because requiring codefendants John and Alexander Ovalle to raise their jury selection claims in the court below "would neither have altered the court's ruling nor served the purposes of the pretrial motion rule," we hold that they did not waive their jury selection claims by neglecting to perform the formal act of joining Canales and Garcia in moving to dismiss on the basis of the jury selection plan. *Cassity,* 631 F.2d at 466. We emphasize that it is only because the Ovalles' codefendants Canales and Garcia raised a timely objection to the seating of the grand and petit juries that the Ovalles are permitted the benefit of this decision. Had Canales and Garcia not raised these objections prior to trial, all of the appellants would be barred from raising such an objection for the first time on appeal or in a collateral proceeding attacking their convictions since the objection would be waived by the failure to object prior to trial. *See* FED.R.CRIM.P. 12(b)(2).

## VI. CONCLUSION

For the reasons stated above, we hold that the implementation of the Jury Selection Plan in the Eastern District of Michigan substantially violates the JSSA, 28 U.S.C. § 1862, and also violates the equal protection component of the Fifth Amendment. The convictions of Alexander Ovalle, John Ovalle, Jr., Benito S. Canales, and Nicholas A. Garcia are **REVERSED** and the cases are **REMANDED** to the district court for further proceedings consistent with this opinion.