## C.   Conclusion

I would reverse the district court's denial of Mr. Blair's motion to dismiss the indictment on the basis of *Ovalle*. However, if the district court had been correct in denying Mr. Blair's motion, I agree with the majority that Mr. Blair's other claims would fail, as do all claims raised by his co-defendant, Connie Blair.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0178P (6th Cir.)
File Name: 00a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT



UNITED STATES OF AMERICA,
　　　　*Plaintiff-Appellee,*

　　　　　*v.*

GEORGE BLAIR (98-2051);
and CONNIE BLAIR, also
known as LAUNA MAIKOWSKI
(99-1626),
　　　　*Defendants-Appellants.*

Nos. 98-2051;
99-1626

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-81440—Patrick J. Duggan, District Judge.

Argued: February 1, 2000

Decided and Filed: May 26, 2000

Before: COLE and CLAY, Circuit Judges; BELL, District
Judge.[*]

---

[*] The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

—————————

**COUNSEL**

**ARGUED:** Milton R. Henry, Bloomfield Hills, Michigan, for Appellants.  Patricia G. Gaedeke, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Milton R. Henry, Bloomfield Hills, Michigan, for Appellants.  Patricia G. Gaedeke, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

COLE, J., delivered the opinion of the court, in which BELL, D. J., joined.  CLAY, J. (pp. 19-28), delivered a separate opinion concurring in part and dissenting in part.

—————————

**OPINION**

—————————

R. GUY COLE, JR., Circuit Judge.  George and Connie Blair were convicted of various drug and money laundering charges and sentenced to lengthy terms of imprisonment. The Blairs now appeal their convictions; George also appeals his sentence.  Specifically, George argues that the district court erred:  by denying his motion to suppress evidence; by denying his motion to dismiss the original indictment based on the composition of the grand jury; by denying his motion to vacate his sentence based on "promises" made to testifying witnesses; and by failing to reduce his sentence based on the 100:1 sentencing disparity of crack cocaine versus powder cocaine. Connie joins George's argument with respect to the district court's denial of their motion to suppress evidence and, in addition, contends that the district court erred by denying her motion to dismiss the superseding indictment based on the composition of the grand jury that returned the original indictment.   For the reasons that follow, we **AFFIRM** the Blairs' convictions and George's sentence.

to remedy the known problem of the underrepresentation of African Americans on federal juries.  Indeed, even in the face of an express acknowledgment of the unfairness of the jury selection system as applied to African Americans by one of the judges from the Eastern District of Michigan and the district's former Chief of Court Operations, the jury selection plan remains the same.  *See* Avern Cohn & David A. Sherwood, The Rise and Fall of Affirmative Action in Jury Selection, 32 U. Mich. J.L. Reform 323, 333 (1999) ("Early experiences suggest that judges are trying criminal cases largely with African-American defendants, prosecuted in front of mostly white judges, by mostly white prosecutors and defense counsel, and with decisions made by almost all-white juries.  This is not fairness in the criminal justice system.").

"The Sixth Amendment requires that the jury venire from which a jury is selected represent a 'fair cross-section' of the community."  *United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975)).   Yet, despite this precious constitutional guarantee, and despite the fact that it is well known that African-American defendants in the Eastern District of Michigan are being deprived of this guaranteed right, the judges of that district have yet to act.  It is for this reason that I continue to urge that the jury selection plan in this district be reformed to insure that African Americans, and other minority groups as well, are provided with the constitutionally sound and fair jury to which they are entitled.  The judges of the Eastern District of Michigan should reevaluate the current system through the use of empirical and statistical data, and devise a plan that comports with the fair representation requirement of the Sixth Amendment.   Until this occurs, granting Mr. Blair's motion to dismiss the indictment (thereby subjecting him to possible reindictment by the government), although *technically* the correct form of relief in this case, would *actually* provide no relief at all.

In addition, the court erroneously assumed that by invalidating Section VIII. B. of the plan, it thereby remedied the constitutionally infirm jury selection process that existed in the Eastern District of Michigan. However, by failing to consider the adequate representation of citizens in the jury array in the Eastern District in the course of its analysis, the *Ovalle* court did not recognize that while it may have been invalidating a jury selection process which was constitutionally infirm as applied to "non-blacks," it was leaving in its wake a jury selection plan which was unconstitutional as applied to blacks – and possibly other minority groups as well – inasmuch as the *Ovalle* court simply invalidated Section VIII. B. of the plan. By hastily ending its analysis there, the *Ovalle* court left African Americans in the same "underrepresented" position as they were before the plan was initiated, thereby simply exchanging one apparently one unfair process for another, without considering the impact of its ruling on the underrepresentation of blacks in the jury selection process -- a problem that had been duly recognized by the United States District Court for the Eastern District of Michigan, and without examining through statistics or empirical data whether the plan left status quo *ante* was constitutionally sound as applied to all minority groups.

*Id*. at 751.

Despite the criticisms and concerns regarding the jury selection plan in the Eastern District of Michigan which were brought to the fore by *Spearman* nearly one year ago, the jury selection plan utilized in this district remains status quo. These concerns are not baseless or without foundation. Because of the long-standing acknowledged underrepresentation of African Americans in the jury venire of the Eastern District of Michigan, the current jury selection process in this district is of questionable constitutionality. Although some minor modifications were made in the jury selection plan that was reinstated by the Eastern District of Michigan in response to *Ovalle*, nothing was done in the main

## I.

Beginning in approximately 1992, George Blair and Connie Blair (aka Launa Miakowski) operated several prostitution houses in Detroit, Michigan. As a part of their operation, the Blairs sold drugs – typically crack cocaine or heroin – to the prostitutes who worked in the houses, most of whom had serious drug addictions. In addition to requiring the prostitutes to buy their drugs from them, the Blairs sold drugs to the prostitutes' clients. The Blairs also sold drug paraphernalia such as syringes and pipes at their houses. During a routine "shift" at a house, the Blairs sold approximately $1000 worth of drugs.

In April 1997, IRS Special Agent Thomas Kraft, having information that the Blairs were engaged in narcotics trafficking, provided an affidavit in order to obtain a search warrant for the Blairs' residence and one of the prostitution houses. A federal magistrate judge issued the warrant, which authorized law enforcement agents to seize records "relating to the transportation, importation, ordering, sale, and distribution of controlled substances." Detroit police officers assisted in the execution of the warrant to search the Blairs' residence. In that capacity, a Detroit police officer who was also a DEA Task Force Agent, Sergeant James Raby, aided in the search. Raby observed on top of a dresser an open pill vial that contained a plastic bag in which there was "a white substance [that appeared] to be narcotics." Raby conducted a field test on the substance which revealed the presence of cocaine.

At this point, Raby left the Blairs' residence to obtain a state search warrant authorizing agents to seize "[a]ll suspected controlled substances, all items used in the [sic] connection with the sales, manufacture, use, storage, distribution, transportation, delivery or concealment of controlled substances." Raby then returned to the Blairs' residence with the state warrant. Law enforcement agents ultimately seized 350 grams of crack cocaine, 50 grams of

heroin, drug paraphernalia, four loaded firearms and approximately $13,000 in cash.

In December 1997, a federal grand jury in the Eastern District of Michigan indicted the Blairs in a six-count indictment, setting forth five counts of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), and one count of engaging in a continuing criminal enterprise (CCE), in violation of 21 U.S.C. § 848. Both George and Connie were represented by the same attorney, Milton Henry,[1] who filed a motion to suppress the evidence seized during the search of the Blairs' residence. Following a hearing, the district court denied the motion.

The case was set for trial. The day before trial was scheduled to begin, Henry indicated that because of potential conflicts, he wished to withdraw from the representation of Connie.[2] The court severed Connie, but proceeded to trial in George's case. George waived his right to a jury trial; thus, the court conducted a bench trial. The court found George guilty of the five drug counts, but acquitted him of the CCE count.

Two weeks after George's trial and prior to Connie's trial, this court issued a decision invalidating a portion of the jury selection plan in the Eastern District of Michigan. *See United States v. Ovalle,* 136 F.3d 1092 (6th Cir. 1998). Citing *Ovalle,* the Blairs filed a motion to dismiss their indictment. On April 24, 1998, the district court denied the motion as to George, but granted it as to Connie after the government agreed that her indictment should be dismissed without prejudice because she had not yet been tried. Approximately two weeks later, another grand jury returned a superseding

---

[1] The government asked the court to instruct the Blairs on the dangers of joint representation. The court did so, at which time the Blairs stated their desire to be represented by the same attorney.

[2] Connie never did obtain new counsel, and Henry continued to represent Connie, as well as George.

Amendment, and how the Court's failure to consider this challenge left the jury selection reform in the hands of the judges of the Eastern District of Michigan who "have failed in their responsibility to devise a jury selection plan which provides for a fair cross section of the community as applied to all races." *See* 186 F.3d at 748. Specifically, *Spearman* stated as follows:

Indeed, at issue in *Ovalle* was whether Hispanics were unconstitutionally represented in the jury array in violation of the appellants's Sixth Amendment right to a jury drawn from a fair cross section of the community, as well as their equal protection rights under the Fifth Amendment. *Ovalle*, 136 F.3d at 1095. However, the *Ovalle* court chose not to adjudicate the issue of fair representation, and instead limited its analysis and holding to the equal protection claim as applied to the "mechanics' of Section VIII. B. *Id.* at 1095, 1106 (finding that underrepresentation of any group "was not the point" of the court's inquiry). In stopping short of properly adjudicating the constitutionality of the jury selection process in the Eastern District, the court further frustrated the problem . . . by dividing the group of potential jurors into two broad categories of blacks and "non-blacks," . . . and in failing to consider actual representation of the individual groups, [thereby] singling out African Americans as somehow being adequately – or more than adequately – represented by the jury selection plan that was in place at the time when, historically, it had been the white population which had been more than adequately represented.

Furthermore, by failing to address whether all groups were constitutionally represented, the court also left unredressed the issue of whether the jury selection plan which was in place at the time, although designed to increase the number of African Americans in the jury array, was in fact providing for a representative number of black jurors.

allowed these defendants to avail themselves of their co-defendants' challenge. This case should be no different. As cited at length by the majority, *Ovalle* has been interpreted as precluding defendants who did not raise challenges to the jury selection plan prior to trial from availing themselves of the *Ovalle* decision. However, these cases did not involve a situation like that in the case at hand, where one co-defendant was able to avail herself of the *Ovalle* decision, but the other co-defendant was not able to avail himself of the same. This case is more factually analogous to that of the Ovalles than that of the cases where a single defendant or co-defendants each raised a challenge under *Ovalle after* the trial had begun or was concluded. Therefore, like the Ovalles, Mr. Blair should be allowed to avail himself of his co-defendant's objection.

However, as noted at the outset of my opinion and as further explained in the section that follows, reindicting Mr. Blair under the jury selection process as it now stands in the Eastern District of Michigan would do nothing but subject him to a jury selection process that is no more representative, and therefore no more constitutional, than that used in connection with his first indictment. In fact, as a result of the *Ovalle* decision, the jury venire under which Mr. Blair would proceed at this point may actually be *less* fair to African Americans than the jury venire under which Mr. Blair first proceeded. This is because the jury selection plan in operation at the time Mr. Blair's indictment was handed down was designed to rectify the underrepresentation of African Americans in the previous plan; however, it is that very "previous plan" -- the plan known to be unfair to African Americans -- which is operation at the current time as a result of the *Ovalle* decision.

**B.    The Jury Selection Process in the Eastern District of Michigan in the Aftermath of the *Ovalle* Decision**

*United States v. Spearman* analyzed at length *Ovalle's* failure to consider the defendant's fair representation challenge to the jury selection process brought under the Sixth

indictment against Connie, charging her with the same six counts set forth in the original indictment and adding a count of money laundering conspiracy, in violation of 18 U.S.C. § 1956. The Blairs then filed another motion to dismiss both indictments, which the district court denied.

In July 1998, the Blairs filed a motion for dismissal or other relief, arguing that the government induced prosecution witnesses to testify, in violation of 18 U.S.C. § 201(c). The district court denied the motion.

In August 1998, the district court sentenced George. George raised several objections at that time, including an objection to the calculation of his sentence on the basis of crack cocaine rather than powder cocaine. The district court sentenced George to 262 months' imprisonment to be followed by five years of supervised release. George filed a timely notice of appeal of his conviction and sentence.

In October 1998, Connie entered into a conditional plea agreement with the government pursuant to Fed. R. Crim. P. 11(a)(2). Connie entered a plea of guilty to one count of possession with intent to distribute controlled substances and to the money laundering conspiracy count, in exchange for the dismissal of the other five charges. In addition, Connie reserved her right to appeal the denial of the joint motion to suppress evidence and her motion to dismiss the superseding indictment. The district court sentenced Connie to 168 months' imprisonment to be followed by five years of supervised release. Connie filed a timely notice of appeal of her conviction.

This court consolidated the Blairs' appeals and granted Connie's motions to consolidate and adopt George's joint appendix and his argument regarding the denial of the Blairs' motion to suppress evidence.

## II.

## A.  MOTION TO SUPPRESS

The Blairs argue that the district court erred by denying their motion to suppress evidence because Agent Kraft's affidavit was insufficient to support the federal search warrant, the federal search warrant did not comply with the particularity requirement of the Fourth Amendment, the federal search warrant was a "subterfuge" to search for drugs, and Sergeant Raby impermissibly field tested the suspected drugs.  The Blairs further argue that the state search warrant was invalid because it was obtained on the basis of Raby's unlawful actions.

We review a district court's factual findings regarding a motion to suppress for clear error, and its legal conclusions de novo.  *See United States v. Leake,* 998 F.2d 1359, 1366 (6th Cir. 1993).  In addition, a magistrate's finding of probable cause for the issuance of a warrant is accorded "great deference."  *See id.* at 1362-63; *United States v. Sonagere,* 30 F.3d 51, 53 (6th Cir. 1994).  On appeal, we must determine whether, in light of the totality of the circumstances, the magistrate had a "substantial basis" for concluding that "a search would uncover evidence of wrongdoing."  *Sonagere,* 30 F.3d at 53 (quoting *Illinois v. Gates,* 462 U.S. 213, 236 (1983)).

## 1.  The Federal Warrant

## a.  Sufficiency of the affidavit

The Blairs argue that the affidavit was insufficient to support the warrant in this case, because the magistrate judge had no basis to conclude that records relating to the Blairs' businesses would be found in their residence.  We disagree.

The application for the federal search warrant was based on an eleven-page affidavit by Agent Kraft, who had extensive experience in drug-trafficking investigations.  Kraft testified that the purpose of the search warrant was "to locate and seize

African Americans.  Therefore, while Hispanics may have had a reason to question the jury selection process in the Eastern District of Michigan, African Americans would not have had such a reason.  In my opinion, this serves as an objective external factor that excused Attorney Henry from raising the issue.

Finally, I agree with Mr. Blair's argument that the district court should have construed his co-defendant's objection to the composition of the grand jury to include him.  Once again, to hold otherwise does nothing more than elevate form over substance, where Mr. Blair is not allowed to avail himself of his co-defendant's challenge simply because he and his co-defendant had separate trials.[1]  If Mr. Blair had been tried with his co-defendant then, like the Ovalles, Mr. Blair would have been able to benefit from his co-defendant's objection.  *See Ovalle*, 136 F.3d at 1109.  Under the majority's view, had the Ovalles moved for a separate trial from their co-defendants Canales and Garcia, then they would not have been able to avail themselves of their co-defendants' objection to the jury venire.

The facts of this case are ones not anticipated by the *Ovalle* court.  It is true that in *Ovalle* the Court stated that "[h]ad Canales and Garcia not raised these objections prior to trial, all of the appellants would be barred from raising such an objection for the first time on appeal or in a collateral proceeding attacking their convictions since the objection would be waived by the failure to object prior to trial."  *See* 136 F.3d at 1109.  However, the fact remains that the Ovalles did not raise such an objection prior to trial and the Court

---

[1]It is significant that Mr. Blair and his co-defendant Connie Blair had proceeded in tandem throughout the criminal process, such that the pretrial conference, motions to quash the search warrant, suppress the evidence, and dismiss the case, were jointly brought by these Defendants. It was only after Mr. Blair waived his right to jury trial that the district court severed Mr. Blair's case from his co-defendant's case. *See* United States District Court for the Eastern District of Michigan (Detroit) Criminal Docket for Case #: 97-CR-18440-1, at 3-6, *United States v. Blair.*

At the time of Mr. Blair's indictment, the jury selection plan in place had been drafted and approved by the judges of the Eastern District of Michigan and approved by the Judicial Counsel of the Sixth Circuit allegedly to remedy the underrepresentation of African Americans. Therefore, Attorney Henry had no reason to believe that the very judges who approved the plan would find it unfair to African Americans. *See Spearman*, 186 F.3d at 754 (finding that "a defense attorney would have had no reason to challenge the jury selection process that was in place in the Eastern District of Michigan prior to *Ovalle,* inasmuch as the court to which he would make his challenge consisted of the very judges who approved the plan"). Those unpublished cases cited and relied upon by the majority fail to recognize that an attorney similarly situated to Mr. Henry would have found any challenge to the jury selection plan futile in light of the fact that the plan had allegedly been designed and approved to correct the underrepresentation of African Americans. In other words, even if an attorney similarly situated to Mr. Henry had held a belief that the plan was unfair to blacks, or had heard of other attorneys who believed the same, there was no basis for the attorney to believe that his challenge to the jury selection plan would be seriously considered – let alone be successful. Indeed, none of the judges of the Eastern District of Michigan have acted upon the concerns expressed more than one year ago regarding the unfair jury selection process as it exists in the aftermath of *Ovalle. See Spearman,* 186 F.3d at 747-55.

Furthermore, what is of critical importance here is the fact that the defendants in *Ovalle* who challenged the jury selection process under the Fifth Amendment right to equal protection as well as under the Sixth Amendment right to fair representation, were *Hispanic*, not African American. In other words, the defendants in *Ovalle* made these challenges on the basis of their *Hispanic* ethnicity; however, an African-American defendant such as Mr. Blair would have had no reason to challenge the jury selection process which allegedly had been designed – and subsequently approved – to correct the constitutionally infirm jury selection process as applied to

evidence relating to an investigation into violations of Title 18, United States Code Section 1956, Laundering of Monetary Instruments, Title 18, United States Code Section 1957, Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity and Title 21, United States Code Section 841 and 846." Kraft's affidavit set forth his experience in investigating the financial aspects of drug trafficking and stated that in his experience it was common for drugs traffickers to store financial records in their homes. Kraft also provided information obtained about the Blairs from several cooperating witnesses, with statements attesting to their reliability. The cooperating witnesses stated that they had worked as prostitutes for the Blairs and purchased quantities of drugs from them. The affidavit also provided that electric company records for the suspected houses of prostitution listed the subscriber for electric services as Launa Miakowski. Finally, the affidavit reported that although the Blairs owned a new home, a motor home, a barber shop, and a party store, George had not filed income tax returns for the years 1990 through 1995, and Connie had filed returns under the name Launa Miakowski indicating a total income of $46,462 for the years 1990 through 1994.

Considering the totality of the circumstances, we find that Kraft's affidavit established probable cause for the issuance of the search warrant. Accordingly, the magistrate judge had a substantial basis to conclude that wrongdoing would be uncovered by the search. The affidavit provided information regarding Kraft's extensive experience in investigating the financial aspects of drug trafficking and his professional opinion that drug traffickers keep financial records at their homes. In addition, the affidavit provided information obtained from reliable cooperating witnesses and electric company records. This information was sufficient for the issuance of the search warrant in this case. *See United States v. Jones,* 159 F.3d 969, 975 (6th Cir. 1998) (stating that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live").

## b. Particularity

The Blairs also argue that the federal search warrant was overbroad in that it lacked particularity as to the items to be seized. Because the Blairs failed to make this argument to the district court, it is waived. *See United States v. Critton,* 43 F.3d 1089, 1094 (6th Cir. 1995) (holding that a defendant who fails to raise a specific issue as the basis for suppression in a motion to suppress to the district court has waived the right to raise that issue on appeal). Even if the Blairs' argument were properly before us, that argument would fail.

It is well settled that items to be seized pursuant to a search warrant must be described with particularity to prevent "the seizure of one thing under a warrant describing another." *Marron v. United States,* 275 U.S. 192, 196 (1927); *see also Andresen v. Maryland,* 427 U.S. 463, 480 (1976). However, we have recognized that the degree of specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime involved. *See United States v. Ables,* 167 F.3d 1021, 1033 (6th Cir.) (citing *United States v. Henson,* 848 F.2d 1374, 1383 (6th Cir. 1988) (citation omitted)), *cert. denied,* 119 S. Ct. 2378 (1999). "Thus[,] a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *Id.* We also have agreed with the Second Circuit's conclusion that "'[o]nce a category of seizable papers had been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category.'" *Id.* at 1034 (quoting *United States v. Riley,* 906 F.2d 841, 845 (2d Cir. 1990)).

Here, the warrant described the items to be seized as "[b]ooks, records, receipts, notes, ledgers, airline tickets, money orders, passports, and other papers relating to the transportation, importation, ordering, sale, and distribution of controlled substances." The warrant also authorized seizure

**(4)** Requests for discovery under Rule 16; or

**(5)** Requests for a severance of charges or defendants under Rule 14.

Fed. R. Crim. P. 12(b)(1)-(5). The Advisory Committee Notes on the 1944 adoption of subdivision (b)(1) and (2) states that the section includes challenges made to the "[i]llegal selection or organization of the grand jury, disqualification of individual grand jurors, presence of unauthorized persons in the grand jury proceedings, defects in indictment or information other than lack of jurisdiction or failure to state an offense, etc." *See* Fed. R. Crim. P. 12(b) advisory committee's note. However, I submit that although the advisory note speaks to illegal selection or organization of the grand jury, it does not speak to the specific nature of an unconstitutional selection of the grand jury, where the defendant is not challenging the selection of *his* particular grand jury based upon an illegality such as juror tampering, but rather the defendant is challenging the unconstitutional nature of the jury selection plan as a whole. *See Greene*, 971 F. Supp. at 1138 (distinguishing *Shotwell Manufacturing v. United States*, 371 U.S. 341 (1963) on the basis of, among other things, the fact that the defendant did not challenge the entire jury selection system, but only the impanelment of his own jury). Accordingly, I believe that Rule 12(b)(2) is not an absolute bar to considering Mr. Blair's challenge to the jury selection plan.

To the extent that one disagrees, I believe that under Rule 12(f), Mr. Blair has shown cause to excuse his failure to raise the challenge to the jury selection plan prior to trial. In concluding otherwise, the majority accurately states that a defense counsel's failure to recognize the factual or legal basis for a claim, or a defense counsel's failure to raise the claim despite recognizing it, does not constitute cause to excuse the lack of a timely objection. However, I respectfully disagree with the majority's conclusion that Attorney Milton R. Henry did not have justifiable cause to excuse his failure to recognize or raise a challenge to the jury selection process.

thereby allowing the government to reindict Mr. Blair, the judges of the Eastern District of Michigan should immediately revise their jury selection plan to comport with all constitutional mandates, so that Mr. Blair would be guaranteed the constitutionally fair trial to which he is entitled. *See United States v. Spearman,* 186 F.3d 743, 747-55 (6th Cir. 1999). Allowing defendants to be tried and convicted under a knowingly unfair jury selection system in the Eastern District of Michigan is unconscionable; allowing Mr. Blair to be twice subjected to an unfair jury selection system would be even worse.

## A. Timeliness of Mr. Blair's Motion to Dismiss the Indictment on the Basis of *Ovalle*

It has been recognized that "the plain language of Rule 12(b) clearly does not require that constitutional challenges to the jury selection process must be made prior to trial." *See United States v. Greene*, 971 F. Supp. 1117, 1137 (E.D. Mich. 1997). Indeed, an examination of the plain language of the rule indicates that it is silent as to constitutional challenges. Specifically, the language of the rule provides as follows:

> **(b) Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:
>
> > **(1)** Defenses and objections based on defects in the institution of the prosecution; or
> >
> > **(2)** Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings); or
> >
> > **(3)** Motions to suppress evidence; or

of records of financial transactions and "electronic equipment to aid them in their drug trafficking activities." Thus, the warrant specified that the records sought were those related to drug-trafficking activities and did not violate the particularity requirement of the Fourth Amendment.

### c. Subterfuge

The Blairs also argue that the federal warrant authorizing seizure of records and documents was merely a subterfuge; that, in actuality, law enforcement agents were impermissibly searching for drugs. As further support for their contention, the Blairs assert that law enforcement agents seized jewelry, money and vehicles that were obviously not records or documents, and that the federal warrant was executed primarily by police officers who worked in narcotics. The Blairs' argument lacks merit.

The federal warrant was issued on the basis of an affidavit provided by an IRS agent who specialized in the monetary transactions that occurred as a result of drug trafficking. Although drug-trafficking activities were suspected, the IRS agent was seeking financial records indicating money laundering or monetary proceeds from illegal activities. Thus, the federal "document" warrant was properly issued and executed by federal agents, with the assistance of Detroit police officers. The investigation did not turn into a drug investigation until law enforcement officers observed the presence of drugs in plain view while executing the federal warrant. The subsequent state warrant then authorized officers to seize items related to narcotics transactions or the proceeds of narcotics transactions, which would include vehicles, jewelry and money. Accordingly, there is no evidence that the document warrant was a pretext to enable law enforcement agents to search for drugs, that the agents "manipulated" the system, or that the agents seized items not authorized by the warrants.

#### d.  The plain view doctrine

The Blairs contend that Sergeant Raby violated their Fourth Amendment rights with respect to the drugs found during the search pursuant to the federal warrant, because the drugs were not in plain view and Raby had no authority to field test the substance.  The Blairs essentially assert that Raby's actions went beyond the scope of the federal warrant.  The district court concluded otherwise, finding that the drugs were in fact in plain view and Raby therefore had authority to perform a field test.  We agree with the district court.

It is well established that law enforcement agents may seize items in plain view, so long as the agent is lawfully present, the discovery is inadvertent, and the incriminating nature of the item is "immediately apparent."  *United States v. Blakeney,* 942 F.2d 1001, 1028 (6th Cir. 1991); *see generally Horton v. California,* 496 U.S. 128 (1990).  When officers executing a search warrant seize an item in plain view that is outside the scope of the warrant, the officers must have probable cause to believe that there is a nexus between the viewed item and criminal activity.  *See United States v. Calloway,* 116 F.3d 1129, 1133 (6th Cir. 1997); *United States v. Beal,* 810 F.2d 574, 576 (6th Cir. 1987).

Here, the district court relied on Raby's statement in his affidavit in support of the state search warrant to determine that the drugs were in plain view.  Raby testified that while searching the master bedroom on the federal warrant, he:

> observed in a [sic] open pill vial, a clear plastic bag containing a hard off white substance that the affiant believed to be cocaine.  The affiant conducted a field test on the substance which tested positive for the presence of cocaine.  Further, the affiant observed numerous bundles several inches each containing one hundred dollar, fifty and twenty dollar bills.  Further, the affiant observed boxes of syringes lying on the bed in the master bedroom.

_____

### CONCURRING IN PART, DISSENTING IN PART
_____

CLAY, Circuit Judge, concurring in part and dissenting in part.  I concur in Judge Cole's well-reasoned and thorough opinion as it relates to all issues except George Blair's challenge to the district court's denial of his motion to dismiss the original indictment based upon the composition of the grand jury.  Mr. Blair's challenge to the composition of the grand jury should not be held as untimely because to do so puts form over substance inasmuch as his attorney had no reason to believe that the jury selection plan in the Eastern District of Michigan at that time would be found unconstitutional.  However, granting Mr. Blair relief and allowing the government to reindict him at this time would do nothing more than put form over substance once again, since the *current* jury selection plan in the Eastern District of Michigan has been found to be unfair to at least one minority group – African Americans.  Which is to say, although this Court held that the jury selection plan under which Mr. Blair's original indictment was delivered was unconstitutional, *see United States v. Ovalle,* 136 F.3d 1092, 1108-09 (6th Cir. 1998), after *Ovalle* was issued, the Eastern District of Michigan simply returned to the jury selection plan status quo *ante*, thereby reinstituting the defective jury selection plan which had previously been found to be unfair to African Americans.  As such, the discriminatory jury selection plan currently in place in the Eastern District of Michigan is no more constitutionally fair than the plan under which Mr. Blair first proceeded.

Because the current jury selection plan in the Eastern District of Michigan has been shown to be demonstrably unfair to African Americans, affording Mr. Blair a new trial at this juncture would appear to be an exercise in futility. Mr. Blair would merely be exchanging one unconstitutional jury selection plan for another in the course of a remand from this Court.  It is for this reason that although I would reverse,

significant is the fact that the witnesses, the prostitutes[,] testified with a degree of regularity that the substance that they were buying from the house in which they were living was, in fact, crack cocaine. They referred to it as rocks that they were purchasing.

The district court's statements provided ample reasoning for sentencing George on the basis of crack cocaine. The district court did not commit clear error.

Finally, George raises a constitutional challenge to the 100:1 sentencing disparity of crack cocaine versus powder cocaine. The law is well settled in this circuit that the 100:1 ratio withstands constitutional scrutiny. *See, e.g., United States v. Bingham,* 81 F.3d 617, 630-31 (6th Cir. 1996); *United States v. Hill,* 79 F.3d 1477, 1488-89 (6th Cir. 1996); *United States v. Reece,* 994 F.2d 277, 278-79 (6th Cir. 1993); *United States v. Tinker,* 985 F.2d 241, 242 (6th Cir. 1992); *United States v. Williams,* 962 F.2d 1218, 1227 (6th Cir. 1992); *United States v. Pickett,* 941 F.2d 411, 418-19 (6th Cir. 1991).

### III.

For the foregoing reasons, we affirm.

In light of this statement, we do not believe that the district court clearly erred in its factual finding that the drugs were in plain view, because Raby was lawfully present, the discovery of the drugs was inadvertent, and the incriminating nature of the drugs was immediately apparent. We further conclude that Raby had probable cause to believe there was a nexus between the suspected drugs and criminal activity.

In addition, we find no problem with the fact that Raby field tested the suspected cocaine. Because the drugs legitimately fell into the plain view exception, their warrantless seizure was permissible. *See Blakeney,* 942 F.2d at 1028. Thus, it would have been permissible for Raby to seize the suspected drugs for later testing. Accordingly, Raby did not violate the Blairs' Fourth Amendment rights by field testing the suspected drugs.[3]

### 2. The State Warrant

The Blairs allege that the state warrant was invalid, because it was issued on the basis of Raby's impermissible discovery of the cocaine. We can easily dispose of that argument, having found that the discovery of the cocaine was constitutionally sound. Moreover, there was no problem with Raby's affidavit in support of the state warrant. Raby's affidavit clearly stated his qualifications and what he observed in plain view during the execution of the federal warrant. Accordingly, the Blairs' argument regarding the legitimacy of the state warrant fails.

---

[3]The fact that Raby field tested the drugs does not indicate that he lacked probable cause to believe that the substance was in fact cocaine. *See United States v. Buchanan,* 70 F.3d 818, 826 & n.5 (5th Cir. 1995) (*as amended in* 1996) (stating that "the fact that officers chose to field test the substance does not indicate that they lacked probable cause to believe the residue was contraband").

## B. *OVALLE* ISSUE

In *Ovalle,* this court held that the jury selection plan in the Eastern District of Michigan – which was essentially the same plan in place at the time of the original indictment in this case[4] – violated the Jury Selection and Service Act, 28 U.S.C. § 1862, and the Equal Protection Clause, because it allowed the removal of every fifth non-black juror from the jury wheel in order to increase the number of black jurors. *See Ovalle,* 136 F.3d at 1099-1100, 1105-07. The Blairs contend that the district court erred by denying their motions to dismiss their indictments – in the case of Connie, the superseding indictment – based on the composition of the grand jury that returned the original indictment pursuant to *Ovalle.* We review a defendant's challenge to the composition of a grand jury de novo. *See Ovalle,* 136 F.3d at 1100.

### 1. George's Argument

In George's case, the district court denied his motion to dismiss the indictment on the basis of *Ovalle,* holding that George waived his right to challenge the composition of the grand jury by failing to make a pretrial motion under Fed. R. Crim. P. 12(b)(2),[5] and by failing to establish cause or

---

[4]The district court stated that, in actuality, a slightly different jury selection plan was in effect at the time of the Blairs' original indictment that allowed juror's names who had been removed to be deferred for use in future jury wheels rather than being eliminated. *See United States v. Blair,* 9 F. Supp. 2d 779, 780 n.1 (E.D. Mich. 1998).

[5]Fed. R. Crim. P. 12(b)(2) provides:

(b) **Pretrial Motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion . . . *The following must be raised prior to trial*: . . .

(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings) . . . .

based on the Tenth Circuit's panel decision in *United States v. Singleton,* 144 F.3d 1343 (10th Cir. 1998) (holding that promises made in a plea agreement could violate 18 U.S.C. § 201(c)), *vacated,* 165 F.3d 1297 (10th Cir.) (en banc), *cert. denied,* 119 S. Ct. 2371 (1999). On appeal, George concedes that the panel decision in *Singleton* has been overruled and acknowledges this court's decision in *United States v. Ware,* 161 F.3d 414, 419 (6th Cir. 1998) (holding that § 201(c), which penalizes an individual for giving anything of value in exchange for testimony, does not apply to the United States government), *cert. denied,* 526 U.S. 1045 (1999). Nonetheless, George contends that § 201(c) was violated because it was not the prosecutor who gave things of value to witnesses, it was Sergeant Raby. This argument fails.

First, as the government notes, George has waived this argument by failing to raise it before the trial court. In addition, even if George had not waived this argument, any "promises" made to witnesses by Sergeant Raby were made on behalf of the government; accordingly, George's argument lacks merit.

## D. CRACK COCAINE/ POWDER COCAINE

George asserts that the government failed to establish at sentencing that the involved cocaine was crack cocaine. We review factual determinations of the sentencing court for clear error. *See United States v. Gort-DiDonato,* 109 F.3d 318, 328 (6th Cir. 1997).

The district court, after extensive arguments, determined that George should be sentenced on the basis of crack cocaine. The court noted:

The other evidence that leads this Court to find by a preponderance of the evidence that the substance involved is crack cocaine is not only do I believe that the substance as identified by the lab report is, in fact, crack cocaine, the witnesses testified with a large amount of consistency. The police officers, who made the search, identified it as, quote, crack cocaine. . . . But as

We further note that Connie does not have a double jeopardy argument arising from the second indictment. It is well established that dismissal of an indictment prior to trial does not raise a double jeopardy issue and does not bar subsequent prosecution for the offenses described in the indictment. *See Pi,* 174 F.3d at 748. Connie argues, however, that jeopardy attached in her case because George had already been tried at the time the indictment against her had been dismissed. Connie's argument is misplaced, as she cannot assert George's jeopardy rights. Connie's trial had been severed from George's and had not yet begun when the original indictment was dismissed and the superseding indictment filed. Accordingly, jeopardy did not attach to the charges against Connie.

Finally, Connie asserts that the illegality of the original indictment somehow tainted the second indictment. Again, Connie misses the mark. Any irregularity in an original indictment has no effect on a subsequent indictment. *See id.* (citing *United States v. Senak,* 477 F.2d 304, 306 (7th Cir. 1973) ("[a] federal grand jury may return a second indictment for the same offense when the first indictment has been dismissed or otherwise found defective")).

### C.  18 U.S.C. § 201 (c)[6]

George argues that his conviction should be vacated on the basis that law enforcement agents impermissibly promised witnesses leniency and paid their expenses in exchange for their testimony against him. George filed such a motion in the district court approximately five months after his trial,

---

[6]Title 18 U.S.C. § 201(c) provides in part that:

(c) Whoever –
   (1) otherwise than as provided by law for the proper discharge of official duty –  . . .
   (2) directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witnesses upon a trial, . . . .

---

prejudice for this procedural default. *See Blair,* 9 F. Supp. 2d at 780-81. We agree.

George contends that the district court should have found that cause existed to excuse his failure to raise the *Ovalle* issue prior to trial, because *Ovalle* was not decided until February 23, 1998, two weeks after his trial. Pursuant to *Ovalle,* it is clear that a defendant's failure to object to the composition of the grand jury prior to trial constitutes waiver of that argument. *See* 136 F.3d at 1107-09; Fed R. Crim. P. 12(b)(2). In order to show cause to excuse this type of procedural default, a defendant must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the . . . procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for the procedural default." *Id.* at 486. George's reliance on the timing of *Ovalle* is therefore misplaced. *Ovalle* did not recognize a new right; instead, it held that the 1992 jury selection plan violated well established constitutional rights. Prior to trial, George failed to recognize or chose to ignore a potential challenge to the jury selection plan. This failure does not establish cause to overcome George's waiver of the issue; the fact that *Ovalle* illuminated this issue two weeks later does nothing to change that result. George has failed to demonstrate an objective external factor that prohibited him from raising an objection to the jury selection plan prior to his trial; accordingly, he has not shown cause to excuse his waiver of this issue. *See United States v.*

---

Fed. R. Crim. P. 12(b) (emphasis added). The effects of failing to raise a 12(b)(2) motion before trial are set forth in Rule 12(f):

> (f) **Effect of Failure To Raise Defenses or Objections.** Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court . . . shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

Fed. R. Crim. P. 12(f).

*Simpson,* Nos. 97-2305, 97-2307, 97-2316, 98-1050, 1999 WL 777348, at *10 (6th Cir. Sept. 21, 1999) (stating that "the fact that Ovalle was not decided until after [defendant's] trial is not sufficient cause for this court to grant relief from the waiver of the issue"); *see also United States v. Bischoff,* Nos. 97-1980, 97-1983, 1999 WL 644340, at *6 (6th Cir. Aug. 19, 1999) (cause not shown for failure to raise *Ovalle* in district court); *United States v. Valme,* No. 98-1340, 1999 WL 519232, at *5 (6th Cir. July 16, 1999) (holding that cause did not exist for defendant's failure to timely raise *Ovalle* issue); *United States v. Garavaglia,* Nos. 98-1512, 98-1674, 1999 WL 220125, at *6 (6th Cir. April 6, 1999) (stating that defendant's contention that "case law was against him" did not constitute cause to excuse waiver of *Ovalle* issue); *United States v. Carr,* Nos. 97-1367, 97-1422, 97-1513, 97-1584, 97-1814, 1999 WL 211928, at *6 (6th Cir. March 11, 1999) (cause not shown for failure to raise *Ovalle* issue prior to trial).

In addition, George argues that the district court should have construed his co-defendant's timely objection to the composition of the grand jury to include him. In so arguing, George relies on the fact that, in *Ovalle,* we allowed a "narrow exception" to the Ovalles with respect to waiver pursuant to Fed. R. Crim. P. 12(b)(2) because their co-defendants raised a timely exception before their joint trial. We stated, however, that:

> We emphasize that it is only because the Ovalles' codefendants Canales and Garcia raised a timely objection to the seating of the grand and petit juries that the Ovalles are permitted the benefit of this decision. Had Canales and Garcia not raised these objections prior to trial, all of the appellants would be barred from raising such an objection for the first time on appeal or in a collateral proceeding attacking their convictions since the objection would be waived by the failure to object prior to trial. See Fed. R. Crim. P. 12(b)(2).

*Ovalle,* 136 F.3d at 1109.

We agree with the district court and the government that Connie's timely objection, i.e., prior to *her* trial, does not create an exception for George. Unlike the situation in *Ovalle,* Connie did not raise her valid objection prior to *George's* trial, but after George had been convicted. This does not fall into the narrow exception to Rule 12(b)(2) created by *Ovalle.* Accordingly, the district court did not err by denying George's motion to dismiss his indictment on the basis of the composition of the grand jury.

### 2. Connie's Argument

As for Connie, the district court dismissed the original indictment with respect to her without prejudice and, two weeks later, a new grand jury issued a superseding indictment against her. Connie now contends that a superseding indictment can only be issued when a valid, prior indictment is still pending. Connie further argues that a superseding indictment cannot arise from an invalid, original indictment. Connie's argument's lack merit.

Connie is correct in that some courts have narrowly defined the term "superseding indictment" to refer to an indictment returned when an original indictment still exists. *See United States v. Bowen,* 946 F.2d 734,735 (10th Cir. 1991) (citing *United States v. Rojas-Contreras,* 474 U.S. 231, 237 (1985) (Blackmun, J., concurring)). However, this court has held that a superseding indictment returned one month after the original indictment had been dismissed for citing the wrong statute was valid. *See United States v. Pi,* 174 F.3d 745, 748 (6th Cir.), *cert. denied,* 120 S. Ct. 74 (1999). Moreover, even if the term "superseding" was inappropriate to describe the second indictment, such a description is mere surplusage that can be ignored. *See United States v. Caldwell,* 176 F.3d 898, 902 (6th Cir.) ("A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a 'useless averment' that 'may be ignored.'" (citation and quotation omitted)), *cert. denied,* 120 S. Ct. 275 (1999).