[No. A131471. First Dist., Div. Four. Dec. 13, 2012.]

LARS OLOFSSON, Plaintiff and Appellant, v.
MISSION LINEN SUPPLY, Defendant and Respondent.

**COUNSEL**

Law Office of Alan Goldberg and Alan Goldberg for Plaintiff and Appellant.

Mitchell, Brisso, Delaney & Vrieze and Nancy K. Delaney for Defendant and Respondent.

OPINION

**REARDON, Acting P. J.**—Lars Olofsson appeals from the judgment entered in favor of respondent Mission Linen Supply (Mission Linen) after the court, in a bifurcated trial of his wrongful termination case, ruled against him on the issue of equitable estoppel. The events in question take place in the context of the employee's request for family leave under the federal and state family leave laws. We conclude that substantial evidence supports the trial court's findings that the employer (1) did not misrepresent by deed that the employee's leave had been approved and (2) was not silent when it had a duty to speak under the applicable regulations. Accordingly, we affirm the judgment.

## I. BACKGROUND

### A. *Statutory Background*

██ California's Moore-Brown-Roberti Family Rights Act (CFRA)[1] and the federal Family and Medical Leave Act of 1993 (FMLA)[2] compel an employer of Mission Linen's size to grant a leave of absence to an employee, and preserve that employee's right to continued employment, if the employee worked 1,250 hours in the year preceding the leave and the leave is for a recognized reason, such as to care for a family member who has a serious health condition. (Gov. Code, § 12945.2, subds. (a), (b), (c)(3); 29 U.S.C. §§ 2611(2), (4), 2612(a), 2614(a).) The family leave laws also impose on employers a legal duty to inform employees of the conditions that must be met to qualify for family leave. (Cal. Code Regs., tit. 2, § 7297.9; 29 U.S.C. § 2619.) It is undisputed that Mission Linen complied with these posting requirements.

██ Under the CFRA, where the employee's need for leave is foreseeable, the employee must provide the employer with reasonable advance notice of this need. (Gov. Code, § 12945.2, subd. (h).) Indeed, the employer may require that employees provide at least 30 days' advance notice before the CFRA leave is to commence if the need for leave is foreseeable based on planned medical treatment for a serious health condition of a family member. (Cal. Code Regs., tit. 2, § 7297.4, subd. (a)(2).) Further, if the need for leave is foreseeable due to a planned medical treatment or supervision, the employee must make a reasonable effort to schedule the treatment or supervision to avoid disruption to the employer's operations, subject to approval of the

---

[1] Government Code sections 12945.1, 12945.2, 19702.3.

[2] Title 29 United States Code section 2601 et seq. The generic phrase "family leave" is used appropriately in this opinion to refer to the rights of an employee under both the CFRA and the FMLA.

health care provider. (*Ibid.*) It is undisputed that Olofsson knew that July and August were the busiest months for Mission Linen.

The employee must "provide at least verbal notice sufficient to make the employer aware that the employee needs CFRA-qualifying leave, and the anticipated timing and duration of the leave." (Cal. Code Regs., tit. 2, § 7297.4, subd. (a)(1).) The employer in turn is charged with responding to the leave request "as soon as practicable and in any event no later than ten calendar days after receiving the request." (*Id.*, subd. (a)(6).)

Additionally, under the CFRA and implementing regulations, an employer may require that an employee's leave request for a family member's serious health condition be supported by a certification from the health care provider for that member. (Gov. Code, § 12945.2, subd. (j)(1); Cal. Code Regs., tit. 2, § 7297.4, subd. (b)(1).) As well, the employer may require that the employee provide such certification within 15 calendar days of the employer's request. (Cal. Code Regs., tit. 2, § 7297.4, subd. (b)(3).)

### B. *Factual Background*

Olofsson was a regular route driver for Mission Linen. In April 2004,[3] he visited his parents in Sweden for four or five weeks. He got the time off by seeking permission from the plant manager, Jack Anderson, Sr. (Anderson). Anderson immediately said Olofsson could go, but he had to fill out a form. On two earlier occasions, Olofsson had gotten nonvacation time off by asking Anderson and filling out a request form, which he submitted to payroll clerk Ruth Clark. Clark managed payroll, and Anderson relied on her "a lot."

As payroll clerk, Clark figured out employee time cards, kept employee attendance records and the like. Her duties included communicating with employees about benefit questions, and she had a role in family leave requests. Clark understood that an employee could take family leave to care for an immediate family member. To qualify, the employee must have worked a certain number of hours over a year's time and must provide a note from the family member's doctor. Once the employee filled out the proper paperwork, the final step was authorization by the company.

During his April visit to Sweden, Olofsson observed that his mother was having a lot of back pain. Fifteen years earlier she had back surgery, and suspected she might have to have the procedure redone. However, his mother was hesitant because of the difficult recovery and the risks involved. Olofsson's 75-year-old father was himself in poor physical condition.

---

[3] All further dates refer to the 2004 calendar year.

After returning from Sweden, Olofsson learned, on June 12 or 13, that his mother had decided to have the surgery. It was scheduled for July 5, and she would leave the hospital approximately July 12. She asked Olofsson if he could take care of her.

On Monday, June 14, Olofsson informed Anderson that he needed seven weeks off, starting July 12, to care for his mother after her July 5 surgery. Olofsson testified that Anderson said he could have the leave if he filled out the application and submitted a doctor's certification. The certification was needed because the leave contemplated a medical procedure, and involved someone other than the employee. Olofsson also stated that thereafter, Anderson approached him "twice[,] asking for the date when [he] was about to leave."

Anderson testified that he did not tell Olofsson in June that he was approved for family leave. Anderson explained that he did not have authority to authorize family leave; authorization must come from the human resources department (HR). Anderson learned about Olofsson's family leave request from an area manager, probably his son, Jack Anderson, Jr. (Anderson, Jr.).

Olofsson spoke to Clark "[s]ometime during June 15 and June 18," and she gave him "some forms to fill out." Olofsson returned the forms to Clark on June 21. Olofsson had checked the box on the form indicating that he was eligible for the leave, testifying he did so because that was his understanding based on what Anderson had told him. According to Clark, Olofsson told her that Anderson, Jr. (an area manager) had already approved the leave. In any event, she informed him that it did not matter what "Jr." said because he could not approve family leave. She "whited out" the mark Olofsson had made. Clark also told Olofsson the leave decision would be made through HR. Olofsson responded that "he didn't care. He was going anyway."[4]

Olofsson did not submit any medical certification at that time. He spoke with his mother and thereafter received a letter from her doctor, which he delivered to Clark on June 30. The letter lacked any printed letterhead indicating it was generated by a medical establishment. Clark wrote a note dated July 1 to Sean Hearn, the regional HR manager, referencing transmittal of the letter from Olofsson's mother's doctor. Therein she stated: "Jack would like for you to call and make sure the letter is actually from the doctor. Please get back to me and let me know if you approve his family leave." At trial, Clark explained that she wrote the note because "Jack wanted to have Sean check into it to see if it was legit."

---

[4] Olofsson denied that Clark told him, "Mr. Anderson would not be in a position to approve the leave but that that would go through [HR]." Olofsson also denied that he told Clark he was going to take the leave regardless of whether the application was approved.

Hearn testified that Clark contacted him around June 28, with questions about Olofsson's family leave application. She had not given Olofsson the official government certificate of health care provider form when Olofsson turned in his leave request. The original doctor's letter, if authentic, provided sufficient information for Mission Linen to determine whether there was a proper medical reason for the requested leave. However, the letter did not appear to be a doctor's note because there was nothing to suggest it was from a doctor's office, and Hearn could not determine that it was from "an actual doctor." HR preferred to have the government form filled out, the significance being that it is "an official government document that we can point to if there was ever a question to our consistency in granting or denying medical leave under similar circumstances." Hearn indicated that HR advised Clark to provide Olofsson with the government form.

According to Olofsson, on Friday, July 2, Clark told him for the first time that the letter from his mother's doctor was not sufficient and gave him a government form for the doctor to complete, saying she needed it as soon as possible. Olofsson did not try to have the doctor complete it because it was the weekend and the doctor would not be working. Olofsson filled out the form based on the information he had and gave it to Clark on July 5, explaining that he filled it out and why. A few days later Clark told him the form had to be filled out by the doctor. He contacted the doctor, who completed the form and faxed it back. Olofsson took it to Clark on July 9. She told him to fax it to HR, which he did.

Meanwhile, area manager Dane Hart instructed Olofsson to train relief driver Kevin Truby. Olofsson began training Truby on June 21. Initially the training period was for one or two weeks, but Hart told him to continue training for a longer period of time, until he left for Sweden. Truby was supposed to take over Olofsson's route in his absence.

Truby testified that he was hired by Mission Linen on June 8, as a relief driver. Area manager Walter Rowley told him that he needed to learn Olofsson's route so he could take it over while Olofsson was "going to be off." It was Olofsson who told Truby he was taking time off to care for his ill mother.

At 11:00 a.m. on July 9, Rowley informed Olofsson that his family leave request was denied. Olofsson learned from Hearn that leave was denied because he did not meet the 1,250-hour requirement.[5] Hearn told him he would lose his job if he left. Olofsson left for Sweden on July 10 to care for his mother, testifying "there was nothing that could be done to change the situation."

---

[5] Olofsson later learned he was 175 or 176 hours short. He attested that prior to July 9, no one at the plant ever told him his leave was in question.

Hearn explained that evaluating the hour requirement is a threshold issue in a leave request. If the employee does not have the 1,250 hours, he or she can delay the request until they have worked the requisite hours. In processing a leave request, whether the employee has met the hours requirement should be determined "[w]ithin a reasonable time period," "within a week." Hearn ultimately figured out Olofsson's hours, although it would have been appropriate for Clark to calculate the hours without his involvement. However, Hearn further explained that between 2000 and 2004, the company went through various stages of improving the timekeeping system, actually switching systems during the process. There were old timekeeping practices in place that only certain people could access, and others that were more specific to the local site. He wanted to make sure the hours were as accurate as possible and did not want all the pressure on Clark, plus he probably had more access and availability to resources to ensure accuracy.

Hearn did the calculation over the course of three to four days, "in between the days of June 28 and July 1st," and concluded the "comparisons and calculations on July 8th," indicating "[i]t did take a lot of time." Clark printed out the report on Olofsson's hours for the preceding 12 months on July 9.

Olofsson called Anderson on July 13, and was told that if he did not show up for work on the 15th, he would be terminated. Olofsson ultimately received a letter from Mission Linen dated July 20 and sent to his address in McKinleyville informing him that he was terminated. He stated that his mother was very upset when she learned he lost his job, and would have been open to rescheduling her surgery had she known this would happen. Olofsson did not tell Anderson or anyone at Mission Linen that his mother's surgery could be rescheduled if the scheduled date was problematic.

## C. *Litigation*

Olofsson sued Mission Linen for wrongful termination in violation of public policy. He alleged he was fired in retaliation for having exercised his rights under the federal and state leave laws. He additionally asserted that Mission Linen was estopped to assert he did not qualify for family leave because the company did not inform him that leave was denied until after his mother had her surgery, and he was the only one who could care for her.

Olofsson successfully moved to bifurcate the equitable estoppel issue for a court trial prior to impaneling a jury for any remaining issues. This appeal followed entry of judgment in favor of Mission Linen.

## II. DISCUSSION

A. *Standard of Review*

The existence of an estoppel is largely a question of fact. Thus, we review the trial court's ruling in the light most favorable to the judgment to determine whether it is supported by substantial evidence. (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360 [56 Cal.Rptr.3d 591].)

B. *Analysis*

█ The doctrine of equitable estoppel may be applied upon establishing the following four elements: (1) the party to be estopped must be apprised of the facts and (2) must intend that his or her conduct shall be acted upon, or must act in such a way that the party asserting the estoppel had a right to believe it was so intended; additionally, (3) the party advancing the estoppel must be ignorant of the true state of facts and (4) must rely on the conduct to his or her injury. (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245]; *Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1268 [84 Cal.Rptr.2d 552] (*Spray, Gould*).)

Olofsson first argues that Mission Linen misrepresented by deed that his leave had been approved. Specifically, Mission Linen's managers instructed Olofsson and Truby to train together for three weeks until Olofsson left for Sweden and Truby could take over his route while he was gone. Olofsson states: "These instructions were, of course, tantamount to direct statements telling Olofsson that his leave was approved and he could be absent from work as of July 12."

We do not see it this way. To begin with, as area manager Rowley explained, Mission Linen arranged to have Truby ride with Olofsson so he would know the route *in the event the leave was approved.* Further, Rowley testified that no one ever told Olofsson that Truby was riding with him because Olofsson's leave request had been approved. Additionally, Clark made it clear that no matter what Anderson, Jr. said, Olofsson was not eligible for leave until HR approved the application, and in graphic fashion underscored the point by whiting out the mark he made signifying his eligibility. Olofsson in turn made it known that he was going to Sweden whether or not his application was approved. Olofsson claims it is significant that Anderson asked him twice about the leave starting date. But of course

Anderson was clear that he never told Olofsson the leave was approved. Olofsson also draws a parallel with the prior approved leaves, but these were not *family leaves* which entailed different procedures.

Viewing the facts in the light most favorable to the judgment, we conclude substantial evidence supports the trial court's decision that Mission Linen did not misrepresent by deed that Olofsson's leave application was approved.

 Olofsson also argues that an estoppel claim can be based on the failure to speak when a party has a duty to speak, citing *Spray, Gould, supra,* 71 Cal.App.4th 1260 and *Kosakow v. New Rochelle Radiology Associates, P.C.* (2d Cir. 2001) 274 F.3d 706 (*Kosakow*). In *Spray, Gould,* an insurance company was estopped from asserting that a claim was time-barred because it had a duty under pertinent regulations to advise the claimant of the applicable time limits, but failed to do so. The court held that an estoppel may arise from silence where there is a duty to speak and the party charged with that duty has an opportunity to speak but, knowing that the circumstances require him or her to speak, remains silent. (*Spray, Gould, supra,* 71 Cal.App.4th at p. 1268.) The insurer's duty to speak arose from a regulation imposing on insurers the duty to advise its insureds of applicable claim limit times. The court explained that the purpose of the regulation was salutary, designed to alert insureds to policy obligations, and to foster fairness, equity and plain dealing in claims handling. It constituted a duly promulgated public policy appropriate to the processing of insurance claims in California, and as such gave rise to a duty to speak for purposes of applying the doctrine of equitable estoppel. (*Id.* at p. 1269.)

 *Kosakow, supra,* 274 F.3d 706, involved a company's failure to post the required notices under the FMLA, raising the question whether by remaining silent when it had a legal duty to speak, that silence constituted an affirmative misrepresentation for purposes of equitable estoppel. The court explained: "[T]he FMLA imposes a legal duty upon the employer to inform its employees of the conditions that they must meet in order to be covered by the FMLA. [Citation.] Moreover, an employer must notify an employee who plans to take medical leave whether her proposed leave is covered by the FMLA before the employee takes the leave. [Citations.] Read together, these provisions indicate that an employee can generally assume that she is protected by the FMLA unless informed otherwise. Accordingly, an employer who remains silent when its employee announces that she plans to take medical leave is effectively misleading that employee into believing that she is protected by the FMLA. Under these circumstances, New Rochelle's silence in the face of its legal duty to inform Kosakow of her ineligibility is properly construed as an affirmative misrepresentation." (*Kosakow, supra,* at pp. 725–726, fn. omitted.)

Olofsson's argument is this: The CFRA regulations mandate that employers respond to leave requests as soon as practicable, with an outside limit of 10 calendar days after receipt of a request. (Cal. Code Regs., tit. 2, § 7297.4, subd. (a)(6).) Olofsson requested leave on June 14, but was not informed that his application was denied until July 9, well beyond the 10-day period for a response. Had he been informed within the 10-day period, his mother would have had time to reschedule the surgery and he could have accrued the hours needed to qualify for the leave.

█ Unlike *Kosakow*, here Mission Linen posted the required notice. At a minimum this notice must convey the eligibility criteria for leave, namely the employee has worked at least 1,250 hours in the 12-month period prior to the commencement of the leave, and the leave is for a medically qualifying circumstance, for example a serious health condition of a parent. As well, the notice must indicate that if possible, the employee must provide at least 30 days' advance notice for foreseeable events such as a family member's planned medical treatment. And further, the text of the notice must advise that the employer may require certification from the appropriate health care provider before allowing the employee leave to care for a family member. (Cal. Code Regs., tit. 2, § 7297.9, subd. (d).) Olofsson thus had constructive notice of the family leave eligibility requirements as well as his responsibility to provide 30 days' advance notice if possible.

Additionally, Olofsson knew from the time of his first conversation with Anderson, or Anderson, Jr., that the company would require a written application and medical certification. He turned in the written application approximately a week later, and did not submit a medical statement from his mother's health care provider to Clark until June 30, 16 days after he first requested leave. The letter itself raised concerns because it came with no letterhead or other identifying information signifying its legitimacy. Clark turned to Hearn with these concerns and thereafter provided Olofsson with the appropriate government certification form, a completed copy of which the company did not receive until July 9.

Without question it is unfortunate that Mission Linen focused more urgently on the medical certification, which ultimately turned out to be adequate, instead of the required minimum hours which is a gatekeeper to eligibility that in most circumstances can be determined relatively quickly. Having said that, the real question is whether Mission Linen was silent here, such that Olofsson could rely on that silence to reasonably conclude his leave was granted. The trial court found that it was not.

 Under the CFRA regulations, the employer has a duty to respond to the leave request within 10 days, but clearly and for good reason the law does not specify that the response must be tantamount to approval or denial.[6] (Cal. Code Regs., tit. 2, § 7297.4, subd. (a)(6).) For example, the employer may not have received all the necessary information to make an informed decision on the leave request within the 10-day window. The CFRA and implementing regulations empower the employer to require certification of a family member's serious health condition, and to require that the same be provided within 15 calendar days of the request therefor. (Gov. Code, § 12945.2, subd. (j)(1); Cal. Code Regs., tit. 2, § 7297.4, subd. (b)(1), (3).) Obviously, the California law contemplates that the employer's actual decision to grant or deny family leave may be made after the expiration of the 10-day window to "respond to" the leave request.

Here Mission Linen first responded by telling Olofsson what he had to do—fill out a form and get medical certification. Next, Mission Linen responded when Clark told Olofsson that approval had to come from HR, he could not assume the leave had been approved, and could not check the eligibility box himself. To underscore the point, she "whited out" his hand-noted approval. This communication occurred on June 21, when Olofsson turned in the form, prior to the scheduled surgery and within the 10-day window. In other words, Mission Linen responded that it was processing the application, and until HR said "Yes," he was not approved for leave. Olofsson got the message because he told Clark he was going whether or not the company approved his leave application. Thereafter, on June 30—more than 10 days after he requested leave—Olofsson turned in the letter from his mother's doctor. The form of this letter raised legitimate concerns on the part of Mission Linen such that on July 2 the company responded further by requesting that Olofsson have the doctor complete the government certification form.

 Substantial evidence supports the trial court's decision that Mission Linen did not remain silent when it had a duty to speak.

---

[6] We are troubled by the fact that Mission Linen waited longer than may have been reasonably necessary to verify whether Olofsson had accumulated the 1,250-hour threshold to qualify for family leave. Had that process occurred within the 10-day period to "respond to a leave request," his ineligibility would have been readily apparent and a quick denial may have avoided the problems that sparked this litigation. As explained above, although more than 10 days may be required to respond to some requests, employees and employers alike would be well served by legislation that clarifies exactly when an employee is entitled to notice that his or her leave request has been approved or denied.

## III. DISPOSITION

The judgment is affirmed.

Rivera, J., and Baskin, J.,[*] concurred.

A petition for a rehearing was denied January 8, 2013, and appellant's petition for review by the Supreme Court was denied March 13, 2013, S208193.

---

[*]Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.